SWANSET DEVELOPMENT CORP. & others[1] *vs.* CITY OF
TAUNTON & others.[2]

Bristol. May 6, 1996. - August 1, 1996.

Present (Sitting at Barnstable): LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR,
GREANEY, & FRIED, JJ.

*Civil Rights,* Availability of remedy, Coercion. *Contract,* Interference with
contractual relations. *Massachusetts Tort Claims Act. Municipal Corpora-
tions,* Liability for tort.

Plaintiffs in an action brought under G. L. c. 12, § 11I, did not establish
that their rights were impaired by "threats, intimidation or coercion"
within the meaning of the statute and summary judgment was correctly
entered for the defendants. [395-397]

In an action alleging intentional interference with contractual or business
relations, summary judgment was correctly granted in favor of the mu-
nicipal defendant inasmuch as the Massachusetts Tort Claims Act,
G. L. c. 258, § 10 (*c*), provides that municipalities are not liable for
such intentional torts. [397]

Plaintiffs asserting claims of intentional interference with contractual or
business relations did not establish, with respect to two defendants, the
existence of any contract or business relations with which those
defendants could have interfered [397] or, with respect to other
defendants, that their conduct interfered with a contract or business re-
lationship of the plaintiffs [397-398].

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 19, 1990.

The case was heard by *Maria I. Lopez,* J., on motions for
summary judgment.

[1]Consolidated Industries, Inc., and Leonard R. Sousa, trustee of Milford
Realty Trust.

[2]Richard Johnson, the mayor of Taunton; Barbara A. Laughlin, the
mayor's administrative assistant; Dorr S. Fox, the senior planner for Taun-
ton; and Robert A. Calvey, Charles Crowley, Alfred J. Dutra, Kevin C.
Martin, Robert G. Nunes, Kevin C. Pietnik, Jr.; Gail A. Saxon; Robert W.
Studley, and Gail F. Tardo, members of the municipal council of Taunton.
Each of these defendants, except for Dutra and Martin, is also sued
individually.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Bernard Saklad* for Swanset Development Corporation.

*Orlando F. de Abreu & Edmund J. Brennan, Jr. (David O. de Abreu & Colleen C. Karsner* with them) for the defendants.

GREANEY, J. The plaintiffs' action in the Superior Court alleges that the city of Taunton (Taunton), and the other defendants, in their capacity as public officials and individually, violated the Massachusetts Civil Rights Act, G. L. c. 12, § 11I (1994 ed.) (Act), and intentionally interfered with the plaintiffs' contractual and business relations in connection with the plaintiffs' efforts to develop property in Taunton. The plaintiffs sought an injunction, damages of "not less than $15,000,000," and attorney's fees. A judge in the Superior Court allowed the defendants' motions for summary judgment. Mass. R. Civ. P. 56 (b), 365 Mass. 824 (1974). We transferred the case to this court principally to consider whether a municipality should be considered a "person" for purposes of liability under the Act. We choose not to decide that question in this case because it has not been adequately briefed and because it is obvious that summary judgment was properly granted for all defendants on the claims under the Act for other reasons given by the judge. Summary judgment for the defendants also was proper on the plaintiffs' intentional tort claims. Accordingly, we affirm the judgment for the defendants.

For the purpose of considering the defendants' motions for summary judgment, the following facts may be accepted as undisputed.[3] Leonard R. Sousa, a real estate developer, acting on behalf of the named plaintiffs, Swanset Development Corp. and Consolidated Industries, Inc., as their president and treasurer, and Milford Realty Trust, as its trustee, undertook in 1988 to develop a "commercial/retail plaza" on property at

---

[3]The plaintiffs filed suit in July, 1990. According to the defendants, the plaintiffs undertook no discovery during the ensuing two and one-half years, at which time the defendants filed their motions for summary judgment. The record on summary judgment consists of the plaintiffs' verified complaint, excerpts from Sousa's deposition testimony, and various exhibits filed in conjunction with the defendants' motions for summary judgment. The defendants do not concede that the facts in the verified complaint are undisputed; rather the defendants assert that, even assuming these facts to be true, they are nonetheless entitled to judgment as matter of law. See *Kyte* v. *Philip Morris Inc.*, 408 Mass. 162, 166 (1990).

304-308 Winthrop Street in Taunton.[4] Based on copies of the Taunton zoning ordinance that he had read, Sousa concluded that a restaurant constituted a permitted use in the zone where the property was located.

Before development could begin, Sousa needed site plan approval and a special permit. To obtain preliminary approval of his plans before seeking approval from the planning board of Taunton (board) and municipal council (council), Sousa, in the fall of 1988, consulted with the defendant Dorr S. Fox, the senior planner for Taunton. In a series of meetings, between September and December, 1988, Fox criticized and rejected a series of revised plans, telling Sousa at one point "[t]hat most developers in the City of Taunton that get approvals use Ted Aleixo." At the time, Theodore Aleixo, Jr., was a local attorney and the State senator representing Taunton. Sousa consulted with Aleixo, but decided not to retain him at that point because he thought that Aleixo's fee (a flat contract fee of $25,000 plus expenses) was excessive. Sousa's plans were eventually approved by Fox, but were rejected by the board. After this rejection, Sousa retained and paid Aleixo who promptly obtained board approval for the plans. Thereafter, on April 5, 1989, the council voted to "approve the site plan and grant [a] special permit to Swanset Development Corporation to build and maintain a building for retail stores and office space, built and located as shown on the documentation filed with the Municipal Council." Although there is no reference to restaurants in the council's decision, Sousa asserts that he had made council members aware of the fact that he intended to include restaurants in the project.

In August, 1989, Sousa entered into a handshake agreement with a sandwich shop to become a tenant in the project. The sandwich shop was refused a building permit on the basis that a restaurant was not a permitted use in the zone, and Sousa was told that the copies of the Taunton zoning ordinance he had reviewed were in error on the point.[5] Sousa was further advised that a special permit was needed from the council for restaurant use.

---

[4]The plaintiff Leonard Sousa is the sole trustee of the Milford Realty Trust and president and treasurer of the two corporate plaintiffs. Accordingly, in this portion of the opinion, we shall generally refer to Sousa with the understanding that the reference is to the named plaintiffs.

[5]It is unclear from the summary judgment record whether the copies of the zoning ordinance which Sousa had reviewed contained typographical

Sousa again consulted with Aleixo, who informed Sousa that "[b]etween the time you started and the time . . . you started building, they changed the law and we don't know if you're right in having the restaurants in there or if you're not." Aleixo stated that Sousa could "take [the building inspector] to court right now and say you're grandfathered in and you have a right to have the restaurants in there, or we can file [for] a special permit" for restaurants. Since a lawsuit would be expensive and time-consuming, Aleixo recommended that Sousa take the latter route. While Sousa was in the office, Aleixo made a telephone call to the mayor, the defendant Richard Johnson, who told Aleixo that there would be no problem in obtaining permission for restaurant use due to the extenuating circumstances. Sousa again retained Aleixo (paying an additional fee of $3,500) to seek the new approval. Sousa proceeded to negotiate and sign leases with three restaurants on October 2, 1989, December 12, 1989, and October, 20, 1990.[6]

Thereafter an application was filed with the council seeking to amend the April 5, 1989, special permit to allow for restaurant use.[7] The council heard the application and denied it on May 9, 1990. The denial was supported by the reasons set forth in the margin.[8] As a result of the denial, Sousa's agreements with the sandwich shop and with the restaurants

errors or whether the ordinance had been changed between the time the copies read by Sousa were printed and August, 1989. It would appear, based on Sousa's account of his conversation with Aleixo, that the ordinance had been revised. No copy of any version of the Taunton zoning ordinance is to be found in the record.

[6]Sousa's recollection of this last date may be wrong, the accurate date being October 20, 1989, but nothing in the case turns on the correctness of this fact.

[7]In the application Sousa stated that "[r]estaurant uses were not proposed originally because municipal sewer service was not available and the Board of Health advised the petitioner that it would not allow restaurants at this location without sewer service. Since that time, the petitioner has managed to extend municipal sewer service to the site, and is therefore now proposing restaurant uses as described in the attached plans."

[8]The council indicated that restaurant use would create an unreasonable increase in traffic, particularly in comparison to the retail and office uses originally approved; Sousa had proceeded unilaterally in implementing proposed changes, including entering contracts with restaurant franchisees, in violation of the express provisions of the original permit; the location, building construction, and access to utilities did not provide an appropriate setting for restaurant use; the establishment of restaurants would increase

were canceled. On May 25, 1990, Sousa filed an action in the Land Court challenging the council's denial.[9]

In early June, 1990, Five Guys from Boston, Inc., one of Sousa's tenants, filed an application with the council for a special permit to operate a pool hall in Sousa's project. The council initially declined to hear the application because of the pending Land Court litigation. Sousa obtained a court order requiring the council to hold a hearing on the application. After a hearing, the council denied the application because the pool hall would unreasonably increase traffic in the area and would require additional police presence.[10]

Sousa refers to other occurrences in support of his claims, as follows. (1) In December, 1988, Sousa, feeling frustrated by the delay in his project, went to see the mayor, Richard Johnson, without having scheduled an appointment. The mayor was not available, but Sousa explained the difficulties he was having in obtaining necessary approvals to the defendant Barbara Laughlin, the mayor's administrative assistant. Laughlin told Sousa that he would not be having problems with his plan if he had "hired the right people." She did not specify who the "right people" were, but Sousa inferred that she was referring to Aleixo. (2) While his application for the original special permit was pending before the council, James Hathaway, an abutter to Sousa's land, claimed a right of way over his land and Sousa's property and offered to sell his land to Sousa for $450,000. Sousa claims that no right of way existed and that the defendant, Gail F. Tardo, a council member, acted in concert with Hathaway in delaying the special permit for Sousa's project in order to support Hatha-

the potential for safety problems in parking on the site, and would increase the density of parking on or near the site; and having restaurants in the development would not be in the best interests of Taunton and its inhabitants.

[9]In the decision allowing the defendants' motions for summary judgment, the judge noted that, as of the date of the summary judgment orders, Sousa had not taken any action to bring the Land Court complaint to trial.

[10]Sousa asserts in his complaint that a billiards parlor was "a permitted use of the [p]remises under the Taunton Zoning Ordinance." Pursuant to G. L. c. 140, § 177 (1994 ed.), the decision on whether to grant a person a license to run a billiard parlor is committed to the discretion of the proper licensing authority. A zoning ordinance which permitted a billiard hall in the area in which the plaintiffs' property was located would not excuse the separate licensing requirement of G. L. c. 140, § 177. See *Marchesi* v. *Selectmen of Winchester*, 312 Mass. 28, 31 (1942).

way's demands. Hathaway had presented evidence to the council, through his attorney, that a right of way existed, a point that was contested, before the council, by Sousa's attorney. Tardo eventually voted to grant Sousa the special permit needed for the project. (3) After the council had granted the original special permit, and before Sousa was advised to seek an amendment permitting restaurant use, the defendant Robert W. Studley, a council member, asked Sousa to consider hiring him to plow snow on the property. Sousa told Studley that he would make contact with him to discuss the matter when winter approached. Sousa did not renew this discussion with Studley, because, when it became apparent that it was necessary to file an application to amend the special permit, Sousa decided it would be improper to have a council member on his payroll. Studley was the council member who most adamantly opposed hearing the application for the permit for the pool hall because of the pending Land Court action.

The plaintiffs' complaint alleges in substance that the defendants violated the Act by conduct, individually and in concert with others, which deprived them of the right to use and develop their property in an appropriate and beneficial manner, and particularly, the right to include restaurants and a pool hall as tenants. The plaintiffs also assert that the defendants' conduct tortiously interfered with their restaurant agreements and their arrangements with the pool hall. We have examined the plaintiffs' assertions under the test governing summary judgment, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), with attention to the materials in the summary judgment record which indicate the existence of admissible evidence. See J.W. Smith & H.B. Zobel, Rules Practice § 56.7, at 355-359 (1977 & Supp. 1996). Summary judgment was properly granted on all of the claims for the reasons we now set forth.

1. *Civil rights claim.* To establish a claim under the Act, the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats, intimidation or coercion." G. L. c. 12, § 11I. See *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 564,

cert. denied, 116 S. Ct. 337 (1995); *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 717 (1989); *Murphy* v. *Duxbury*, 40 Mass. App. Ct. 513, 518 (1996).

Even if we assume that the Act applies to municipalities, and that the plaintiffs have made an adequate showing as to all defendants on the first two points, see *Murphy* v. *Duxbury, supra*, it is clear that the plaintiffs have not presented any indication by admissible evidence showing that their rights were impaired by "coercion." (The plaintiffs do not maintain that conduct that could be construed as "threats" or "intimidation" has occurred.) We have recognized that an owner of real property has a constitutional right to use and improve that property, subject, of course, to limitations on development lawfully imposed by State law or by municipal regulation. See *Bell* v. *Mazza*, 394 Mass. 176, 178 (1985). We have referred to " 'coercion' as 'the use of physical or moral force to compel [another] to act or assent.' " *Freeman* v. *Planning Bd. of W. Boylston, supra* at 565, quoting Webster's New Third Int'l Dictionary 439 (1981).[11] We have indicated that "a direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do." *Id.* at 565. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 & n.11 (1987). While the plaintiffs allege that the defendants acted in concert to delay and impede the development of their property, they do not allege that any defendant sought to persuade them to alter or to amend their plans to conform with conditions which the defendants sought to impose illegally on the plaintiffs. Contrast *Freeman* v. *Planning Bd. of W. Boylston, supra* at 565 (recognizing possible coercive effect of planning board's attempt to impose its will on the plaintiff by requiring design changes not mandated by local ordinance). To the extent that the plaintiffs allege that various delays were a deliberate attempt to frustrate their development plans, they have alleged a direct deprivation of rights rather than an attempt at coercion. See *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington, supra* at 781.

Sousa points to the pressure on him to hire Aleixo as an al-

[11]In *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 566 n.18, cert. denied, 116 S. Ct. 337 (1995), we assumed without deciding the point that coercion which does not involve physical force might violate the Act, and we do so again for the purpose of this case.

legation of coercion sufficient to satisfy the statutory prerequisite of coercion. In point of fact, he alleges that this pressure came from Fox, who, however, approved Sousa's development plans before Aleixo was hired, and Laughlin, who had no involvement in reviewing the plaintiffs' development plans. By the time the defendant council members reviewed the plans, Sousa had hired Aleixo. The obstacles he alleges were placed in his path by individual council members were unconnected to his decision to hire Aleixo. Moreover, this allegation of pressure, or coercion, is only tenuously connected to the constitutional right which the plaintiffs allege was impaired. There is nothing else in the defendants' alleged conduct which creates a triable issue as to coercion, and the plaintiffs' claims under the Act fail for that reason alone.

2. *Intentional torts.* To establish intentional interference with contractual or business relations, the plaintiffs must show (1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages. See *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 812, 815-817 (1990). The basis for the plaintiffs' intentional tort claims is the defendants' alleged interference with signed lessees as well as other potential tenants and business clients.

The plaintiffs' tort claims against Taunton fail because under the Massachusetts Tort Claims Act, G. L. c. 258, § 10 (*c*) (1994 ed.), municipalities are not liable for "any claim arising out of an intentional tort, including . . . interference with advantageous relations or interference with contractual relations."

The plaintiffs' intentional tort claims against Fox are predicated on his conduct between September and December, 1988, in rejecting the plans presented by Sousa. The tort claims against Laughlin are based on her allegedly hostile attitude when Sousa went to the mayor in December, 1988, to complain about his difficulties. These claims fail because no contractual or business relations existed in December, 1988, with which Fox and Laughlin could have interfered. There is also nothing in the record which shows that Johnson did anything which improperly interfered with a contract or a business relationship of the plaintiffs.

The plaintiffs' intentional tort claims against the members of the council are predicated on their alleged wrongful refusal to grant a special permit for restaurant use and to hold a hearing on, and approve, the application for a special permit for the pool hall. The council members, acting individually, would likely have immunity against the plaintiffs' claims because, in considering the permit applications, they were making discretionary decisions within the scope of their official duties. See *Duarte* v. *Healy*, 405 Mass. 43, 50-51 (1989). We need not dwell on the point, however, because the record is insufficient, under a summary judgment standard, to demonstrate that the council members tortiously interfered with the plaintiffs' business arrangements.

*Judgment affirmed.*