# YALCIN AYASLI & another[1] *vs.* RICHARD S. ARMSTRONG & another.[2]

No. 99-P-274.

Barnstable. February 8, 2001. - December 18, 2002.

Present: GREENBERG, BECK, & RAPOZA, JJ.

*"Anti-SLAPP" Statute. Civil Rights,* Availability of remedy, Coercion, Damages, Attorney's fees.

In a civil action, the judge did not err in denying the defendants' special motion to dismiss the complaint pursuant to G. L. c. 231, § 59H, the "anti-SLAPP" statute, where the defendants failed to demonstrate that the claims against them, which alleged that they had interfered with the plaintiffs' use and enjoyment of their property, had no substantial basis other than or in addition to the defendants' petitioning activities. [748-749]

In a civil action brought by plaintiffs alleging violation of the Massachusetts Civil Rights Act (Act), G. L. c. 12, §§ 11H, 11I, the trial judge properly denied the defendants' motions for directed verdict and for judgment notwithstanding the verdict, where the evidence demonstrated that the defendants, by their persistent efforts to disturb the plaintiffs' enjoyment of their land, to impede access to the land, to limit the land's use, and to make the plaintiffs so uncomfortable that they would abandon their property, had interfered with the plaintiffs' use and enjoyment of their property through coercion by means of a scheme of harassment, in violation of the Act. [749-754] RAPOZA, J., dissenting.

In a civil action brought by plaintiffs alleging violation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, the trial judge did not err in allowing the jury to consider certain evidence as relevant to the defendants' motive or state of mind, in declining to instruct the jury to disregard a certain argument of the plaintiffs, in declining to instruct the jury on the advice of counsel defense, or in allowing the jury to consider evidence of the plaintiffs' subjective feelings. [754-756]

In a civil action brought by plaintiffs alleging that the defendants had interfered with the plaintiffs' use and enjoyment of their property through coercion, in violation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, sufficient evidence supported the jury's conclusion that the plaintiffs were entitled to damages for increased costs associated with the delay in being able to use their house, for the loss of use of property during the delay, and for emotional distress. [756-757]

---

[1] Serpil Ayasli.

[2] Patricia Armstrong.

This court concluded that, in a civil action brought by plaintiffs alleging violations of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I, the defendants failed to demonstrate that the judge abused his discretion in his award of attorneys' fees and costs to the plaintiffs. [757-758]

CIVIL ACTION commenced in the Superior Court Department on August 18, 1994.

A special motion to dismiss was heard by *Gerald F. O'Neill, Jr.,* J., and the case was tried before him.

*Marcus E. Cohn* for the defendants.

*Kevin P. O'Flaherty* for the plaintiffs.

BECK, J. The plaintiffs and the defendants own adjacent waterfront property in Falmouth. The one thing on which they agree is that the defendants, Richard and Patricia Armstrong, opposed proposed renovations to the plaintiffs' house. The plaintiffs, Serpil and Yalcin Ayasli, claim that the defendants "engag[ed] in . . . behaviors which were calculated to harass, intimidate, and coerce [them] into abandoning the [r]enovation," thus interfering with the Ayaslis' right to use and improve their property, in violation of the State Civil Rights Act, G. L. c. 12, §§ 11H, 11I. The defendants claim that they did nothing more than exercise their legal rights as abutters to petition for relief. After the defendants' motion to dismiss pursuant to G. L. c. 231, § 59H (the "anti-SLAPP" statute) and their motion for summary judgment were both denied, the case went to trial before a Superior Court jury. The jury returned verdicts for the plaintiffs, awarding them substantial damages and attorneys' fees. The principal issues at trial, as well as on appeal, concern the applicability of the "anti-SLAPP" statute and the State Civil Rights Act to the facts of this case.

1. *Factual and procedural background.* From the evidence introduced at trial, the jury could have found the following facts. See *Freeman* v. *Planning Bd. of W. Boylston,* 419 Mass. 548, 550, cert. denied, 516 U.S. 931 (1995). In June, 1993, the Ayaslis bought oceanfront property in Falmouth from Barbara Sweet, the widow of Richard Armstrong's uncle, for $500,000. The property consisted of an early 1900's bungalow style house with a two car garage on 1.6 acres of land. The Armstrongs owned a house on property adjacent to that of the Ayaslis and

had lived there year round since 1972. Richard Armstrong also had an interest in a third adjacent lot that he and his two sisters inherited from their parents (the white house).

The house the Ayaslis bought had five bedrooms and a floor area of approximately 1780 square feet. Richard Armstrong's aunt and uncle had used the house as a vacation retreat for fifty years. It had not been updated for many years and needed renovation. In recent years it had been used very little. Access to the Ayaslis' house was via a private road marked by a street sign for "Sweet Road" and a deeded right of way over the Armstrongs' land.

In extended negotiations with his aunt, Richard had offered $285,000 for the property. He emphasized that the property was "very important" to the family, calling it their "anchor to windward." In a letter to his aunt's lawyer, he wrote that "it would be devastating . . . not to be able to keep [the property] as part of the family for generations to come." He expressed concern about "outsiders" buying the house. In a memorandum on posttrial motions, the trial judge (who saw the property along with the jury during a view) described the property as part of "a [three]-lot compound off a private road leading to a beautiful area overlooking Megansett Harbor in North Falmouth." He described the Armstrongs' house as "beautiful" and the property the Ayaslis bought as "the most picturesque."

The plaintiffs took possession in June, 1993. They and their three children, then ages approximately fourteen, seven, and five, spent about three weeks at the property between June and September that first year. In those first weeks, the Ayasli children were frightened by the Armstrongs' dogs, which appeared to be chasing them when they walked along Sweet Road. There was a beware of dog sign on the Armstrong property; the electronic fence controlling the dogs was invisible. On at least one occasion, the dogs appeared on the Ayaslis' property. Mrs. Ayasli was also concerned for the children's safety when members of the Armstrong family hit golf balls from the lawn of the white house into the water on the Ayaslis' property where the children played and swam.

Not long after taking possession, the Ayaslis engaged an architect to draw plans to renovate the house. Those plans were

submitted to the Falmouth conservation commission, which held a hearing on November 10, 1993. At the hearing, Richard Armstrong read a letter recounting his connection to the property going back five generations and pointing out his concerns about the property, including the water supply, wetland issues, flooding, easements and rights of way, access, and intensity of use. He had expressed the same concerns in negotiations with his aunt, claiming that the property had numerous environmental problems, and asserting that his "thorough knowledge of state, county and local regulations" would be helpful in resolving these issues. The commission issued an order of conditions on November 17, 1993. See G. L. c. 131, § 40.

On December 14, 1993, the Ayaslis' architect, as their agent, filed an application for an "alteration/addition permit" with the Falmouth building department. The application, estimating the cost of the project at $150,000, was approved by the building department on December 27, 1993. The proposal included replacing the existing cesspool with a "Title V" septic system.

The contractor's crew began work on the house on January 20, 1994. At that time, the contractor went to see Patricia Armstrong to discuss the project with her. He explained that there would be extensive renovation, including some demolition, such as taking the chimney down and removing the roof. She expressed surprise at the extent of the proposed work and said that she had a video camera and would be keeping track of the project. The next morning the chairman of the conservation commission and the commission administrator appeared on the Ayaslis' property shortly after 8:00 A.M., explaining that they had received a complaint from the Armstrongs.

After conferring with the chairman and the administrator, the contractor wrote a letter notifying the commission that he would be starting work on the property. A building permit issued several days later.

Once the contractor started work, he discovered that the house was not structurally sound. The corner posts were rotten and the footing would not support the structure. In order to make a full inspection, the contractor took the roof off, removed two of the exterior walls, and exposed the porches. When Patricia Armstrong saw the state of the house, she called the conservation

commission again. After inspecting the property, the commission issued a cease and desist order, on the ground that "[t]he scope of the work being done on the property far exceed[ed] the scope of the work permitted by [the conservation commission]."

The contractor arranged a meeting with the defendants at their home a few days later to review the project. Patricia Armstrong told the contractor she hoped that the house would not be rebuilt and that the property would become conservation land. She also revealed that she had already gone onto the property to take photographs.

At about the time the work began, a new sign appeared on the right of way. A piece of cardboard had been stuck in the ground on which the words "Ayasli right of way" were written with an arrow pointing in the direction of an old right of way referred to as the "loop" road. The route was impassable, covered with rocks and a pile of dense grade fill. It was not possible to drive around it. Serpil Ayasli felt humiliated because only they were directed to a route that was impassable.

The architect and the contractor returned to their drawing boards and filed a new notice of intent explaining in detail the background of the project, the original scope of work, the changes in the scope of work, and the proposed additional work. The conservation commission held a second hearing on March 16, 1994. The plaintiffs and the defendants were there, as well as the contractor and his wife, the architect, and the plaintiffs' lawyer. Serpil Ayasli commented to Patricia Armstrong that it was too bad that the hearing was the first time they had met, and said that the Ayaslis also cared about the "historical nature of the house." Patricia Armstrong replied that she did not care about that and that it was "not personal" but the property was her "backyard" and "now that the house was down, she wanted it to stay down."

As the parties left the hearing, at which the commission apparently indicated its intent to approve the order of conditions, the plaintiffs' lawyer suggested that the parties try to resolve some of the issues between them. Patricia Armstrong responded: "This is not the end. We will do everything we can to stop this project." Mrs. Ayasli testified that she felt threatened by that

remark and wondered whether they would have the financial and emotional strength to see the project through.

On the morning following the March 16 hearing, the contractor went to the building department and the conservation commission. In the hall between the two offices, he encountered the defendants. Patricia Armstrong waved a piece of paper and said she was going to appeal. She called the contractor a "dupe" of the plaintiffs. Shortly after that encounter, the contractor saw the defendants in the board of appeals room.

Both Armstrongs were active in local affairs. Richard had served on a local hospital board and as an elected selectman, as well as assistant secretary of environmental affairs for the Commonwealth. Patricia was involved in a number of human services volunteer activities as well as the "Sustainability Indicators Council . . . a creature of the Cape Cod Center for the Environment."

On April 4, 1994, counsel for Richard Armstrong and his sisters wrote to the building commissioner contending that the commissioner did not have authority to issue an amended building permit for the Ayaslis' property because a special permit was required. The commissioner nevertheless issued an amended building permit on April 19, 1994. Two weeks later, Richard Armstrong and his sisters filed an appeal to the Falmouth zoning board of appeals (board) claiming that the project required either a special permit or a variance. The board determined that the then-pending plan for the property required a special permit because it proposed to convert a "cottage" to a year-round structure. The board allowed the appeal, and directed the revocation of the building permit.

The Ayaslis filed a petition for a special permit on July 28, 1994. (They also filed an appeal from the board decision requiring a special permit.) The board held a hearing on the Ayaslis' petition on August 24, 1994. Counsel for the Armstrongs argued that the Ayaslis' proposed construction required a variance, and that a special permit would not suffice. He also asked the board to attach certain special conditions to any permit: to limit the use of the property to a summer cottage; to prohibit use as a principal residence; to restrict use between October and April to

no more than three days per week; and to forbid any further construction on the property.

On September 26, 1994, the board approved a special permit for the property. In so doing, the board concluded that the "site [was] both suitable and adequate for the proposed use," and noted that the Ayaslis were planning to reduce the number of bedrooms from five to four. The board further found that "the granting of [the] permit [would] have no adverse impact on traffic flow or safety. . . . [and that] the renovated structure will improve that visual character of the neighborhood and will have no impact on the views of the neighbors." It also found that "the non-conforming nature of this property is neither being increased [nor] intensified by allowing the proposed alterations." Eighteen days later, the Armstrongs filed an appeal from the board's decision in Superior Court pursuant to G. L. c. 40A, § 17, claiming that the board exceeded its authority because a variance was necessary. At the end of 1994, the Armstrongs had gates erected across the "cut-off" route, forcing the Ayaslis to use the impassable loop route.

The Armstrongs' challenge to the allowance of the special permit, and the Ayaslis' related action challenging the decision that a special permit was required, were settled in a handwritten agreement in January, 1996, on the day scheduled for trial in Superior Court, and were dismissed. The construction work on the Ayaslis' property was finished in late summer of that year, two years after the board of appeals had approved the special permit.

2. *Further procedural background.* About a week prior to the August, 1994, special permit hearing before the board of appeals, the Ayaslis filed the complaint at issue here. They claimed the Armstrongs had violated their civil rights, specifically their right to use and enjoy their property under arts. 1, 10, and 12 of the Massachusetts Declaration of Rights. See *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. 390, 396 (1996). See also *Brett* v. *Building Commr. of Brookline,* 250 Mass. 73, 77 (1924). The defendants answered and filed a counterclaim for abuse of process. On March 13, 1995, the defendants filed a special motion to dismiss under G. L. c. 231, § 59H, the anti-SLAPP statute. After a hearing on April 28, 1995, the motion to dismiss

was denied without comment. The plaintiffs' motion to amend their complaint to add a count for declaratory judgment concerning their right to use the cut-off route to their property, and a count that the Armstrongs wrongfully had interfered with their right of way, was allowed in September, 1995.

In June, 1997, the defendants filed a motion for summary judgment. In denying the motion, a Superior Court judge (not the trial judge) determined that there were "genuine issue[s] of material fact, as to whether the [d]efendants were pursuing a legitimate right they had, or merely opposing the plaintiff[s] in their efforts to build a house, which had the effect of interference or attempted interference with a secured right, . . . [and as to] whether the interference was by threats, intimidation, or coercion." He concluded that the defendants' state of mind was crucial and that the matter was therefore inappropriate for decision by summary judgment. After more maneuvering, the case finally went to trial before a jury on January 12, 1998. At the conclusion of the plaintiffs' case, the defendants moved for a directed verdict. They also attempted to renew their special motion to dismiss under the anti-SLAPP statute. The judge denied the motion for directed verdict and refused to "revisit[]" the denial of the special motion.

At the close of all the evidence, the defendants renewed their motion for a directed verdict. The judge ruled for the defendants on the plaintiffs' claims regarding the right of way and sent the plaintiffs' civil rights claim and the defendants' abuse of process claim to the jury on special questions. The jury returned a verdict for the plaintiffs on the civil rights count, and awarded the Ayaslis $211,000 in damages. They found against the Armstrongs on their counterclaim for abuse of process. Following the verdict, the trial judge denied the defendants' motions for judgment notwithstanding the verdict and for a new trial, and awarded the plaintiffs attorneys' fees and costs of $150,000 and $10,000 respectively. He also allowed the plaintiffs' motion for attachment of real estate in the amount of $400,000.

3. *Issues on appeal.* The defendants set out six grounds for appeal: (1) their special motion to dismiss under the anti-SLAPP statute should have been allowed; (2) there was insufficient evidence that they violated the Ayaslis' civil rights; (3) it was

error to deny their motion for judgment notwithstanding the verdict; (4) certain errors of the trial judge warrant a new trial on the civil rights claim; (5) the trial judge's order regarding attorneys' fees and costs was erroneous; and (6) they were entitled to a new trial on their abuse of process counterclaim. We now address each of these issues.

4. *Special motion to dismiss.* Six months after the plaintiffs served the defendants with their complaint, the defendants filed a special motion to dismiss pursuant to G. L. c. 231, § 59H, "on the grounds that the [c]omplaint [was] based on the defendants' exercise of their right of petition." Section 59H, enacted by St. 1994, c. 283, § 1, is known as an anti-SLAPP statute. See *Duracraft Corp.* v. *Holmes Prod. Corp.*, 427 Mass. 156, 159-160 (1998). (The acronym "SLAPP" stands for "Strategic Lawsuit Against Public Participation." *Id.* at 160 n.7.) In order to prevail on such a motion, the moving party "who 'asserts' protection for its petitioning activities [must] make a threshold showing through the pleadings and affidavits that the claims against it are 'based on' the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Id.* at 167-168. The Armstrongs did not make such a showing. There was no error in the judge's denial of the special motion.

The allegations in the plaintiffs' verified complaint and the affidavit submitted in opposition to the SLAPP motion "[did] not concern solely the defendants' pursuit of legal rights." *Bell* v. *Mazza*, 394 Mass. 176, 183 (1985). Although one could infer that the defendants' persistent petitioning activities played a role in the plaintiffs' decision to file the complaint, there was also an independent basis for the complaint — that the defendants were intentionally interfering with the plaintiffs' right to use and enjoy their property. Patricia Armstrong clearly stated that she wanted the Ayaslis' house to "stay down," and that she intended to do everything she could to stop the work on their house. See *id.* at 179 (threat to "do 'anything,' 'at any cost,' to prevent the [plaintiffs'] construction of any tennis court"); *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington*, 399 Mass. 771, 781 (1987) (statements "to the effect that [the selectmen] would take any action necessary to stop the development"). It was

more than the Armstrongs' petitioning activities that prompted the Ayaslis' suit. In addition to Patricia Armstrong's statement about her intentions, there were the erection of the sign directing those trying to reach the Ayaslis' property to an impassable way, the threatening dogs at the boundaries of the Ayaslis' property, and the golf balls falling on the Ayaslis' beach where the children swam. These facts supported the plaintiffs' claim that the Armstrongs were interfering with their use and enjoyment of their property.

5. *Civil rights claim.* The defendants next claim that the judge erred in denying their motions for directed verdict and for judgment notwithstanding the verdict because there was insufficient evidence that their conduct violated the State Civil Rights Act. In either case, "[t]he test for determining the correctness of the judge's action . . . requires us to examine the evidence, including all reasonable inferences, in the light most favorable to [the plaintiffs]." *Bicknell, Inc.* v. *Havlin,* 9 Mass. App. Ct. 497, 497-498 (1980).

The State Civil Rights Act, G. L. c. 12, §§ 11H, 11I, was enacted "to address the racial violence that engulfed parts of Boston during court-ordered school desegregation" in the 1970's. Heins, Massachusetts Civil Rights Law, 76 Mass. L. Rev. 77, 81 (1991). See *Batchelder* v. *Allied Stores Corp.,* 393 Mass. 819, 821 (1985); *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, 473 n.8, cert. denied, 513 U.S. 868 (1994). In order to prevail on a complaint under this statute, "the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Swanset Dev. Corp.* v. *Taunton,* 423 Mass. at 395. See G. L. c. 12, §§ 11H, 11I. Whether conduct constitutes threats, intimidation, or coercion under the statute is tested by a reasonable person standard. See *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. at 474-475.

By omitting the State action requirement found in the Federal civil rights statute, see 42 U.S.C. § 1983, the Legislature "greatly expand[ed] the reach of the Massachusetts [law]."

Alperin & Shubow, Summary of Basic Law § 5.51, at 558 (3d ed. 1996). "[L]ike other civil rights statutes, [the State Civil Rights Act] is remedial. As such, it is entitled to liberal construction of its terms." *Batchelder* v. *Allied Stores Corp.*, 393 Mass. at 822. It was not, however, intended to "create 'a vast constitutional [and statutory] tort.' " *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. at 565, quoting from *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 718 (1989). "[T]he insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the act." *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. at 565-566.

The plaintiffs claim that the defendants "attempted to intimidate, harass and coerce [them] into abandoning [their planned] [r]enovations, and, thereby, . . . substantially interfered with [their] use and enjoyment of [their] [p]roperty." See arts. 1, 10, and 12 of the Massachusetts Declaration of Rights. The defendants contend that they did not interfere with these rights and that even if they did, it was not by threats, intimidation, or coercion.

The factual context of the case before us is considerably removed from the concerns that prompted the enactment of G. L. c. 12, §§ 11H, 11I. Our task is to determine whether the claims at issue here fit within current jurisprudence under the statute. In doing so, the question before us is not whether were we the fact finders we would come to the same conclusion as the jury did, but "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s].' " *Rolanti* v. *Boston Edison Corp.*, 33 Mass. App. Ct. 516, 520 (1992), quoting from *Dobos* v. *Driscoll*, 404 Mass. 634, 656 (1989).

a. *Threats, intimidation, and coercion.* The judge correctly instructed the jury on the definitions of threats, intimidation, and coercion. A threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. at 474. Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Ibid.* And coercion is "the application to another of such force, either physical or moral, as

to constrain him to do against his will something he would not otherwise have done." *Ibid.*, quoting from *Deas* v. *Dempsey*, 403 Mass. 468, 471 (1988).

b. *Physical confrontation.* The defendants assert at the outset of their appellate argument that "[t]he Supreme Judicial Court . . . has consistently held that conduct violating the Civil Rights Act must involve 'actual or potential physical confrontations involving a threat of harm,' " quoting from *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. at 473 n.8. They claim the plaintiffs have not shown that there was such physical coercion in this case and that therefore there was insufficient evidence to support the jury's verdict.

The first problem with this argument is that there was no such instruction below. The defendants did submit a written request that the judge inform the jury that "relief under the Civil Rights Act has been generally limited to situations involving a physical confrontation accompanied by a threat of harm." However, they did not bring the request to the judge's attention during the discussion concerning jury instructions. Nor did they argue the point in closing, or object to the instructions as given. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974).

Ordinarily we would deem this argument waived. See *Narkin* v. *Springfield*, 5 Mass. App. Ct. 489 (1977). However, the plaintiffs have not raised the issue of waiver. Rather, they argue first that the defendants have overstated the role of physical confrontation, and second, that there is sufficient evidence of confrontation in this case to support the jury's verdict. We therefore consider the substance of the defendants' argument.

The cases have not been so consistent on the issue of force or physical confrontation as the defendants would have it. To be sure, most recently, in concluding that there was no violation under G. L. c. 12, § 11I, where the defendant public school department insisted that a home visit was required for permission to home school, the Supreme Judicial Court stressed that the defendant "did not utilize physical force." *Brunelle* v. *Lynn Pub. Schools*, 433 Mass. 179, 183 (2001). Over the years, other cases have found no violation on similar grounds. See *Bally* v. *Northeastern Univ.*, 403 Mass. at 719; *Layne* v. *Superintendent, Mass. Correctional Inst., Cedar Junction*, 406 Mass. 156, 158

(1989) ("no actual or potential physical confrontation nor a threat of harm" in limiting access of handicapped prisoners to prison library); *Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991); *Webster v. Motorola, Inc.*, 418 Mass. 425, 430 (1994) (no allegation of physical confrontation).

On the other hand, recent cases also have indicated, without deciding, that coercion not involving physical force may violate the Act. *Freeman v. Planning Bd. of W. Boylston*, 419 Mass. at 566 n.18. See *Swanset Dev. Corp. v. Taunton*, 423 Mass. at 396 n.11. See also *Broderick v. Roache*, 803 F. Supp. 480, 486 (D. Mass. 1992) (physical nature of threat not decisive consideration); *Acciavatti v. Professional Serv. Group, Inc.*, 982 F. Supp. 69, 78 (D. Mass. 1997) (physical confrontation not always required). We turn now to a consideration of the case law concerning enjoyment of property.

c. *Property rights cases.* The leading case involving property owners' use of their property is *Bell v. Mazza*, 394 Mass. 176 (1985). In that case the Bells' neighbors objected to the Bells' plans to build a tennis court on their property "in an affluent neighborhood . . . in the coastal area of Cohasset." *Id.* at 179. Peter Mazza warned the Bells that he "would do 'anything,' 'at any cost,' to prevent the . . . construction of any tennis court." The neighbors wrote letters, formed an association to prevent construction, threatened to sue the blasting contractor, attempted to induce the electric company to discontinue electric service to the Bells, and at one point physically blocked Diana Bell's passage. The Mazzas also called the police and fire departments concerning the tennis court construction. *Id.* at 179-180. The court concluded that the plaintiffs had stated a claim sufficient to survive a motion to dismiss a State civil rights complaint. *Id.* at 184.

In *Pheasant Ridge Assocs. Ltd. Partnership v. Burlington*, 399 Mass. at 781, the Supreme Judicial Court held that the statements of certain selectmen that "they would take any action necessary to stop the development [under G. L. c. 40B, §§ 20-23, the Anti-Snob Zoning Act]" were open to interpretation, including whether they included a threat of physical "eviction" or "harm." It was therefore for the fact finder to determine whether the speakers "could reasonably be understood only to

express an intention to use lawful means to block the development . . . [and therefore not] actionable under § 11I." *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington, supra* at 781-782, citing *Bell* v. *Mazza*, 394 Mass. at 183. See *Tortora* v. *Inspector of Bldgs. of Tewksbury*, 41 Mass. App. Ct. 120, 123 (1996) (building inspectors' threats to have the plaintiffs' building permit revoked and to arrest Albert Tortora for minor infractions warranted trial for "interfer[ing] with the [Tortoras'] right to live a normal life at their home by overzealous 'inspections' and improper threats of arrest"). While no single point is determinative, the aggregate facts of this case are sufficient to create a jury question whether the defendants' conduct as a whole violated G. L. c. 12, § 11I. The Armstrongs clearly stated that they wished the Ayaslis' property to become conservation land, and that they would do everything they could to stop any further work on the house. They also sought conditions that would have severely limited the Ayaslis' use of the renovated house. Although, as counsel for the plaintiffs acknowledged in closing argument, the dogs and the golf balls were not themselves violations of the Civil Rights Act, they were, as counsel argued, "clear signs about the way the Armstrongs thought of [the Ayaslis'] property[, a]s an extension of their own." Indeed, Patricia Armstrong told Serpil Ayasli that the property was the Armstrongs' "backyard." The jury could have viewed the Armstrongs' conduct as constituting persistent efforts to disturb the plaintiffs' enjoyment of their land, to impede access, limit use, and generally make the Ayaslis so uncomfortable in that secluded location that they would abandon their plans for the house. Put another way, a reasonable person could have felt threatened and intimidated and feared that the Armstrongs would always try to interfere with their access to and enjoyment of their property, as the Ayaslis testified that they felt. See generally Heins, Massachusetts Civil Rights Law, 76 Mass. L. Rev. 77, 82-83 (1991) (noting tension between statute's broad language and need for limits).

6. *Scheme of harassment.* In denying the defendants' motions for new trial and for judgment notwithstanding the verdict, the trial judge concluded that "the defendants' actions constituted a classic case of coercion by means of a scheme of harassment,"

citing *Bell* v. *Mazza*, 394 Mass. 176 (1985); *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. at 565; *Smith* v. *Longmeadow*, 29 Mass. App. Ct. 599, 603 (1990); *Murphy* v. *Duxbury*, 40 Mass. App. Ct. 513, 518 (1996); *Tortora* v. *Inspector of Bldgs. of Tewksbury*, 41 Mass. App. Ct. at 123. He called their conduct "outrageous[]" and wrote that their effort to seek administrative review "was unrelated to any legitimate concern for environmental or zoning protection."

Correctly observing that the cases the judge cited concern the conduct of public boards, the defendants argue that proof of a civil rights violation based on a scheme of harassment should be limited to complaints against such boards and not applied to private citizens. The plaintiffs counter that the "scheme of harassment" principle has been applied primarily to public boards because they are otherwise immune from suit for their administrative actions under the Civil Rights Act.

Except for a clause in Yalcin Ayasli's affidavit alleging that the Armstrongs "engaged in a pattern of harassing behavior by which they have attempted to intimidate [the Ayaslis] into abandoning [their] renovations," and a brief statement in the plaintiffs' closing argument, in which they argue that certain actions of the Armstrongs discussed above showed an intent to "intimidate, harass, [and] coerce," there is nothing in the record to suggest that the plaintiffs tried their case on a theory of a scheme of harassment. We therefore do not address the issue further.

7. *Motion for new trial.* The defendants next argue that their motion for new trial should have been allowed. They cite four errors. We consider each in turn.

a. *The cut-off evidence.* First they claim that the judge erred in permitting the jury to consider the defendants' actions concerning use of the cut-off route. The judge told the jury that the Armstrongs had the right to determine the location of the Ayaslis' easement for a right of way. He instructed them that they should not consider evidence regarding the right of way as evidence of a violation of the Civil Rights Act. He did allow the jury to consider the evidence as relevant to motive or state of mind. Assuming the defendants' appellate rights were preserved on this issue (after denying defense counsel's request at the

charging conference that the jury be instructed not to consider that evidence, the judge said "I'll save your rights"), see *Flood v. Southland Corp.*, 416 Mass. 62, 67 (1993); Mass.R.Civ.P. 51(b), there was no reversible error. The jury could consider the Armstrongs' abrupt unilateral method of communicating the change in the location of the right of way as evidence of their state of mind.

b. *Plaintiffs' improper argument.* The defendants next argue that the judge "committed prejudicial legal error" in failing to instruct the jury to disregard the plaintiffs' argument that Richard Armstrong's appeal from the allowance of a special permit was taken in bad faith. After the plaintiffs' closing argument, the defendants argued to the judge that it was false for the plaintiffs to argue that if the Armstrongs felt a variance was needed, they had to appeal from the decision that a special permit was required. The judge responded that plaintiffs' counsel argued that the defendants had twenty days to appeal from that decision and they did not, but the judge pointed out that it was clear to the jury (presumably from what was before them) that the defendants did not have to appeal. There was no further objection following the judge's comments on the issue. Even assuming the defendants saved their rights, as to which we have some doubt, the jury had before it both the July, 1994, decision of the board of appeals noting that an appeal from that decision was required to be made within twenty days, and the September, 1994, decision with the same instruction regarding appeal. The jury also had the defendants' Superior Court complaint appealing from the September, 1994, decision. There was no reversible error.

c. *Advice of counsel defense.* There was no error in the judge's refusal to instruct the jury on the advice of counsel defense. The defendants did not plead the defense in their answer. See Mass.R.Civ.P. 8(b), (c), 365 Mass. 749 (1974). Moreover, the judge allowed the defendants fully to argue the point in their closing argument.

d. *The Ayaslis' subjective feelings.* Finally, the defendants argue that the judge erred in allowing the jury to consider evidence of the plaintiffs' subjective feelings. There was no error. The judge made it clear that the test of whether there was

a violation of the Civil Rights Act "is an objective one," based on the reasonable person standard. The judge also instructed the jury that if they determined there was a civil rights violation, the Ayaslis were entitled to emotional distress damages for humiliation and other feelings "reasonably related" to the violation.

8. *Damages.* In their closing argument, the plaintiffs argued that they were entitled to damages for increased costs associated with the delay in being able to use their house, for loss of use of the property during the delay, and for emotional distress. The delay at issue was the period from September, 1994, to August, 1996, representing the time the property was "tied up" as a result of the Armstrongs' appeal from the September, 1994, decision of the board allowing the special permit. The jury awarded the plaintiffs $211,000 in damages.

At trial, the defendants objected to "the Court's instruction on damages for loss of use and diminution of enjoyment of life on the grounds that there is no evidence that was presented on loss of use or diminution of enjoyment of life." The defendants made a similar claim in their motion for new trial, and they repeat this argument on appeal, claiming that because the plaintiffs offered "no evidence of money lost proximately caused by the delay, i.e., the fair rental value of the property. . . . [T]he entire award of damages must have been arrived at in whole or in part by speculation." However, the judge clearly instructed the jury that they could "consider any loss of use, harm as suffered from the inability to use the cottage [in determining damages]. Not in an economic sense because there is no evidence they were going to rent it out; but in diminution of the enjoyment of life."

In a footnote to their brief, the defendants assert that the two year delay in construction resulting from their appeal "was caused by delays inherent [i]n the judicial system." This single sentence does not rise to the level of acceptable appellate argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 97 n.11 (1999). We therefore focus on whether there was sufficient evidence to support the jury's award on the delay theory. We are mindful of the trial

judge's statement in his memorandum and order denying the defendants' motions for judgment notwithstanding the verdict and for a new trial that "[t]he outrageousness of the defendants' conduct is reflected in the size of the verdict in usually conservative Barnstable County." Moreover, a trial judge has broad discretion in ruling on motions based on claims of excessive damages. See *Powers* v. *H.B. Smith Co.*, 42 Mass. App. Ct. 657, 665 (1997).

Yalcin Ayasli testified that the cost of the repairs to the house increased by $11,000 as a result of the delay. The jury saw the property during the view at the beginning of the trial. They therefore collectively could answer the questions the plaintiffs' counsel rhetorically asked in closing argument — "What's the value of the loss of use of the property during that time. The value of vacation periods lost or the value of summer holidays lost." As to emotional distress, the jury saw and heard the testimony of all the witnesses over several days of trial. They could have credited the plaintiffs' testimony about their emotional distress and humiliation. The assessment of such damages was within their competence. See *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 824 (1997) (there is little in legal authority to guide review of an emotional distress award; traditionally left to trier of fact).

9. *Attorneys' fees and costs*. The defendants argue that the judge erred in awarding the plaintiffs $150,000 in attorneys' fees and $10,000 in costs. Although the amounts were less than the plaintiffs requested (the plaintiffs requested $191,172 in fees and $14,913 in costs), the defendants argue, as they did in the Superior Court, that the plaintiffs' application did not present adequate information about "multiple task entries" or work on issues other than the civil rights claim.

In awarding a reduced amount, the judge indicated that he shared the defendants' concerns. He concluded that the "plaintiffs [were not] entitled to recover attorneys' fees for the easement issue or for defending the claim for abuse of process" and determined "that some credit [was] due for [the time the plaintiffs' experienced second chair] spent sitting through the trial." Although lacking a factor-by-factor analysis, these awards appear to be within the trial judge's discretion. See *Berman* v.

*Linnane,* 434 Mass. 301, 302-303 (2001). In any case, it is the defendants' obligation to show the trial judge abused his discretion. Because the appendix does not include a copy of the plaintiffs' application for fees, we are unable to examine the judge's decision in any further detail.

For the reasons set out above, the judgment is affirmed, as is the order denying the defendants' motions for judgment notwithstanding the verdict, for a new trial, and to strike the plaintiffs' application for attorneys' fees and costs.

*So ordered.*

RAPOZA, J. (dissenting). I dissent because I conclude that the trial judge erred when he denied the defendants' motion for a directed verdict on the plaintiffs' civil rights claim under G. L. c. 12, § 11I.[1]

This case presents a squabble between neighbors, which, as is often the case, began peacefully enough but soon escalated in intensity. The Armstrongs did not, at first, oppose the construction work at the Ayaslis' home.[2] Matters changed shortly after construction began. Work commenced prior to the issuance of a building permit and, once under way, the scope of the project exceeded what had been permitted by the conservation commission. What followed was a succession of petitions, ap-

---

[1]Although I am also of the view that the Ayaslis' civil rights claim against the defendants had no substantial basis other than the Armstrongs' lawful petitioning activities, I do not consider whether the motion judge properly denied the defendants' special motion to dismiss under the "anti-SLAPP" statute, G. L. c. 231, § 59H. I decline to do so because my conclusion with respect to the Ayaslis' civil rights claim is based upon evidence developed at trial, which would not have been before the earlier judge who decided the motion to dismiss solely on the pleadings and affidavits, as provided in the statute. See G. L. c. 231, § 59H. See also *Duracraft Corp.* v. *Holmes Prod. Corp.,* 427 Mass. 156, 167-168 (1998). Moreover, even though the trial judge later denied the defendants' renewed motion to dismiss under G. L. c. 231, § 59H, at the close of the plaintiff's evidence, he did so on the ground that the "anti-SLAPP" statute was no longer an issue in the case, the motion having been previously denied, and not on the basis of the evidence presented at trial.

[2]Indeed, Richard Armstrong publicly welcomed his new neighbors at a meeting of the Falmouth conservation commission and stated that he hoped they would enjoy the property for many years.

peals, and complaints in which both the Ayaslis and the Armstrongs sought to gain the upper hand.

In order to establish a claim under G. L. c. 12, § 11I, the Massachusetts Civil Rights Act, "the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 395 (1996). Assessing the Ayaslis' claim by that standard, even with the evidence taken in the light most favorable to them, they have failed to establish a prima facie case against the Armstrongs. Accordingly, the trial judge should have allowed the Armstrongs' motion for a directed verdict on the count alleging a civil rights violation.

Property owners, such as the Ayaslis, have a constitutional right "to use and improve [their] property, subject . . . to limitations on development lawfully imposed." *Id.* at 396. The issue before us is whether the actions of the Armstrongs interfered with that right by means of "threats, intimidation or coercion" within the meaning of the Civil Rights Act. As set out by the majority, the offending actions of the Armstrongs fall into three categories: (1) petitioning activities before town boards and in Superior Court; (2) statements by Mrs. Armstrong addressed directly or indirectly to the Ayaslis; and (3) miscellaneous activities of the Armstrongs, including the keeping of dogs and the hitting of golf balls.

Where the Armstrongs' petitioning activity was factually supported, arguably based in the law, and generally successful, it did not amount to a violation of the Civil Rights Act. None of the legal measures taken by the Armstrongs constituted an interference with the Ayaslis' legitimate right to enjoy or develop their property, considering that the Ayaslis had commenced work on the premises without a building permit, embarked on a construction program that exceeded the limits of their original authorization, and, finally, obtained a new building permit

without first procuring a special permit, as was required.[3] Indeed, the legitimate basis for the Armstrongs' petitioning activity is underscored by the fact that, although they did not always receive satisfaction from local authorities, their requests for relief were, to a large extent, successful. Thus, at varying points during the construction project the conservation commission issued a cease and desist order to the Ayaslis; the building inspector issued to the Ayaslis a notice of five violations of the State Building Code, including the commencement of work without a building permit; and the zoning board of appeals revoked the Ayaslis' building permit due to their failure to have first obtained a special permit.[4]

Moreover, the Armstrongs' efforts to see that their neighbors complied with pertinent regulations in the development of an environmentally sensitive piece of land does not remotely approach the outrageous conduct in *Bell* v. *Mazza*, 394 Mass. 176 (1985), cited by the majority. There, unlike here, the plaintiffs complied with all relevant regulations and were without fault in the development of their land. See *Bell* v. *Zoning Bd. of Appeals of Cohasset*, 14 Mass. App. Ct. 97 (1982). Nonetheless, in *Bell* v. *Mazza*, the defendants mounted a campaign against them and formed a homeowners' association to oppose the plaintiffs' construction of a tennis court on their property. Although the plaintiffs possessed all necessary permits to proceed, one or both defendants (1) attempted to have the plaintiffs' electrical service cut off; (2) physically blocked the passage of one of the plaintiffs; (3) called in complaints about the plaintiffs to the police and fire department; and (4) became so disruptive at the building inspector's office during a meeting about the construction that the police were called to remove him. *Bell* v. *Mazza*,

---

[3]Where the Armstrongs' petitioning activity did not constitute interference with the rights of the Ayaslis, as to this category, one need not reach the issue of whether there was interference by "threats, intimidation or coercion." See *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. at 395.

[4]Although I do not address the anti-SLAPP issue, I pause to note that the Ayaslis filed suit against the Armstrongs shortly after that couple successfully challenged the Ayaslis' building permit, and ten days before a scheduled hearing on the Ayaslis' request for a special permit. I need not resolve whether the timing of the Ayasli lawsuit was coincidental, retaliatory, or for the purpose of dissuading the Armstrongs from an overly vigorous opposition to the special permit application.

394 Mass. at 180. Considering such egregious actions, the court concluded that the plaintiffs had surmounted the "minimum hurdle" to survive a motion to dismiss for failure to state a claim under G. L. c. 12, § 11I. *Bell* v. *Mazza*, 394 Mass. at 184.[5] As unpleasant to the Ayaslis as some of the Armstrongs' actions may have been, the dispute between them was largely confined to meetings of the conservation commission and the zoning board of appeals,[6] and the Armstrongs' behavior both at the meetings and elsewhere did not involve the thuggery that was evident in *Bell* v. *Mazza*.

In support of its view that the defendants acted in a threatening, intimidating, and coercive manner, the majority also cites the purported comments of Patricia Armstrong, variously made to either the contractor or the Ayaslis themselves, to the effect that she would be keeping an eye on the project, that she hoped the property would revert to conservation land, that once the building was down she hoped it would stay down, that she and her husband were going to appeal, and that she and her husband would do anything to stop the project. The majority also notes that she allegedly entered upon the premises and took pictures of the construction in progress, although apparently never with the Ayaslis present. However intemperate or inconsiderate such comments and conduct may have been, they fall far short of constituting violations of the civil rights of the Ayaslis, whether considered alone or together with the other evidence in the case.

The fact that relations were strained between the parties during construction was not surprising. Nor should a certain amount of posturing between them have been unexpected. Huffing and puffing is not uncommon during neighborhood disputes, especially those wending their way through town hall en route to further litigation. Nonetheless, the expressions of frustration to which Patricia Armstrong may have given voice in the course

---

[5]The standard in the present case is, of course, different. In reviewing the denial of a motion for directed verdict, we consider whether, on the evidence presented, the plaintiffs made out a prima facie case and not whether, as in *Bell* v. *Mazza*, they merely stated a claim sufficient to survive a motion to dismiss.

[6]In fact, the parties met for the first time at a second hearing of the conservation commission, held on March 16, 1994, approximately nine months after the Ayaslis acquired and began to occupy the property.

of her dealings· with the Ayaslis did not rise to the level of "threats, intimidation or coercion" as those terms are used in G. L. c. 12, § 11I. Even the most excited of Mrs. Armstrong's remarks failed to achieve the level of intensity that characterizes a " '[t]hreat' . . . [which] involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994). Nor did she engage in " '[i]ntimidation'[, which] involves putting [another] in fear for the purpose of compelling or deterring conduct." *Ibid.* Finally, Mrs. Armstrong never participated in acts of "coercion[, which involves] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.' " *Ibid.,* quoting from *Deas* v. *Dempsey,* 403 Mass. 468, 471 (1988).

The remaining factors propounded by the Ayaslis and considered by the majority are also insufficient to sustain a claim under the Civil Rights Act. The two primary complaints of the Ayaslis, which counsel and the majority contend evince the Armstrongs' frame of mind rather than constitute actionable civil rights claims, involve the Armstrongs' two dogs and the hitting of golf balls. As to the first, the barking of the Armstrongs' dogs purportedly frightened the Ayaslis' children. This was due, as it turned out, to the dogs being confined by an "electronic fence" which, although invisible to the human eye, effectively restricted them to the Armstrong property. There is absolutely no suggestion in the record that the Armstrongs set their dogs upon the Ayaslis, their children, or anyone else. Concerning the second complaint, the Armstrongs allegedly continued a questionable practice that had become traditional with their family: driving golf balls from their property into the ocean. The Ayaslis contend that this custom continued unabated, despite their purchase of the intervening property between the Armstrong home and the water. The record does not suggest, however, that this practice was ever carried on when the beach was in use.

It is also significant to note that these events occurred solely during the three weeks that the Ayaslis first occupied their property, between June and September, 1993. This was long

before the Ayaslis began their renovation project that later became the subject of the Armstrongs' petitioning activities and long before the Ayaslis filed their complaint alleging civil rights violations. Thus, there was insufficient evidence to support a reasonable inference that the Armstrongs were using their dogs or launching golf balls to threaten, intimidate or coerce the Ayaslis into abandoning their plans to renovate their property.

Finally, there is no civil rights violation lurking in the Ayaslis' assertion that the Armstrongs' posting of signs to divert traffic denied them access to their property. The reason is simple: the judge directed verdicts in favor of the Armstrongs on the counts of the Ayaslis' complaint claiming a right of way and alleging wrongful interference with that right of way. The Ayaslis, who did not appeal the separate judgment resulting from those verdicts, cannot now rely on the same claims, already rejected by the trial court, to bolster their assertion that the Armstrongs violated their constitutional right to use their property.

In conclusion, the Civil Rights Act exists to protect the rights of persons secured by the Constitution and laws of both the United States and the Commonwealth. It was not intended, however, to "create 'a vast constitutional [and statutory] tort.' " *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 565, cert. denied, 516 U.S. 931 (1995), quoting from *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 718 (1989). I am concerned that the majority has expanded the application of the Civil Rights Act beyond the boundaries set by the Legislature to actions that, at most, sound in simple nuisance and trespass. In so doing, it diminishes the statute's significance and dilutes its purpose, which is to protect the secured rights of individuals from conduct that society deems to be truly unacceptable.

The type of neighborhood imbroglio that we consider here is not at all uncommon, and I am loath to see such disputes in the future inevitably give rise to claims of civil rights violations merely because one of the participants proves intemperate or inconsiderate. "[T]he insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the act." *Freeman* v. *Planning Bd. of W. Boylston,* 419 Mass. at 565-566. Where the plaintiffs failed to satisfy that requirement, the trial judge should have allowed the defendants' motion for a directed verdict.