Robert O'NEIL, Plaintiff,

v.

DAIMLERCHRYSLER CORP., Grava of Medford, Inc., Ralph Grava, Eric Grava and Peter Grava, Defendants and Counterclaim Plaintiffs.

Civil Action No. 06–10767–JGD.

United States District Court, D. Massachusetts.

Jan. 7, 2008.

Timothy K. Cutler, Cutler and Associates, Boston, MA, for Plaintiff.

George W. Mykulak, Wilmerhale LLP, David B. Chaffin, Hare & Chaffin, Boston, MA, Christopher J. Sullivan, Edward C. Cumbo, Sullivan & Collins, Woburn, MA, John F. Rossi, Kevin J. Fleming, Edwards Angell Palmer & Dodge LLP, Boston, MA, for Defendants and Counterclaim Plaintiffs.

### *MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

Plaintiff Robert O'Neil ("O'Neil") brought this action following an incident that took place on January 6, 2006, when, he alleges, the individual defendants, Ralph Grava, Eric Grava and Peter Grava

(collectively, "the Gravas"), entered O'Neil's home office without permission and made threatening statements to him. The incident occurred after O'Neil sued the Gravas' automobile dealership, defendant Grava of Medford, Inc. ("Grava Motors"), in small claims court for allegedly failing to reimburse him for costs incurred to repair O'Neil's two automobiles under the terms of extended warranty agreements, which O'Neil had purchased from Grava Motors. O'Neil and defendant DaimlerChrysler Corporation ("DaimlerChrysler") were the parties to the warranty agreements, and Grava Motors was authorized to perform service and repair work on the plaintiff's vehicles under the terms of those agreements.

The plaintiff originally asserted thirteen causes of action against the defendants, as well as two claims for relief.[1] (Compl. (Docket No. 1) ¶¶ 105–94). He has since dismissed and/or withdrawn a number of his claims.[2] The remaining claims consist of claims against the Gravas and Grava Motors for conspiracy (Fourth Cause of Action), as well as claims against all of the defendants for assault (Sixth Cause of Action), trespass (Seventh Cause of Action), intentional infliction of emotional distress (Eighth Cause of Action), negligent inflic-

tion of emotional distress (Ninth Cause of Action), false imprisonment (Tenth Cause of Action), civil rights violations (Twelfth Cause of Action), and violation of Mass. Gen. Laws ch. 93A ("Chapter 93A") (Thirteenth Cause of Action).

Presently before this court are "DaimlerChrysler's Motion for Summary Judgment" (Docket No. 53) and the "Motion for Summary Judgment of Grava of Medford, Inc., Ralph Grava, Eric Grava, and Peter Grava" (Docket No. 51). By their motions, the defendants are seeking summary judgment on all of the claims still pending against them. For all of the reasons detailed herein, this court finds that DaimlerChrysler is entitled to judgment as a matter of law on all of the claims asserted against it, and that the Grava defendants[3] are entitled to summary judgment with respect to the plaintiff's claims against them for false imprisonment and civil rights violations. This court further finds that there are disputed facts precluding the entry of summary judgment for the Grava defendants in connection with the plaintiff's remaining claims. Therefore, the case shall proceed to trial on the Fourth through Ninth and Thirteenth Causes of Action, i.e., the claims of con-

---

1. The fourteenth and fifteenth causes of action set forth in the plaintiff's complaint consist of claims for injunctive relief and a stay away order, but do not allege any independent legal claims.

2. On August 8, 2007, the plaintiff and DaimlerChrysler filed a stipulation dismissing with prejudice the plaintiff's claims against DaimlerChrysler for breach of contract and warranty (First Cause of Action), negligent selection of Grava Motors (Second Cause of Action), negligent supervision of Grava Motors (Third Cause of Action) and conversion (Eleventh Cause of Action). (Docket No. 70). The plaintiff orally withdrew his Lanham Act claims against DaimlerChrysler (Fifth Cause of Action) during the August 10,

2007 hearing on the defendants' motions for summary judgment. In addition, in connection with the instant motions, the plaintiff has withdrawn his claims against the Gravas and Grava Motors for breach of contract and warranty (First Cause of Action), violation of the Lanham Act (Fifth Cause of Action) and conversion (Eleventh Cause of Action). (Pl.'s Opp. to Grava Mot. (Docket No. 60) at 2).

3. While stating that the Grava defendants must each be viewed individually, the Grava defendants have not distinguished their individual roles in the events at issue, or identified any claims unique to any specific defendant. Consequently, for purposes of the motion for summary judgment, the defendants will be treated collectively.

spiracy, assault, trespass, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of Chapter 93A. Accordingly, DaimlerChrysler's motion for summary judgment is ALLOWED and the Grava defendants' motion for summary judgment is ALLOWED IN PART and DENIED IN PART.

## II. STATEMENT OF FACTS

### Scope of the Record

The plaintiff has filed a motion to strike (Docket No. 63) by which he is seeking an order striking four exhibits submitted by DaimlerChrysler in support of its motion for summary judgment, as well as those portions of the Affidavit of Benjamin N. Strauss, Esq. in which DaimlerChrysler's counsel purports to authenticate the challenged exhibits. The exhibits at issue consist of two Chrysler Corporation Sales and Service Agreements, as well as the Additional Terms and Provisions expressly incorporated into the Agreements by reference. As grounds for his motion, the plaintiff argues that Attorney Strauss lacks the personal knowledge necessary to authenticate the documents.

In opposition to the motion, DaimlerChrysler filed the Affidavit of Jane Steinmetz ("Steinmetz Aff.") (Docket No. 68), DaimlerChrysler's Manager of Dealer Agreements. By her Affidavit, Ms. Steinmetz attests to the authenticity of the challenged documents and sets forth facts showing that she has the personal knowledge to do so. In particular, Ms. Steinmetz states that she is responsible for overseeing the collection and retention of dealer agreements entered into by DaimlerChrysler in its regular course of business, and for overseeing the electronic database in which the company maintains copies of those agreements. (Steinmetz Aff. ¶¶ 2–3). She also states that she caused the challenged documents to be produced to the plaintiff in discovery, and she attests that true and accurate copies of those documents are attached to her Affidavit. (Id. ¶ 4). Accordingly, the plaintiff's motion to strike is DENIED AS MOOT. The court will consider the exhibits in connection with the summary judgment motions.

### Statement of Material Facts [4]

The following material facts are undisputed unless otherwise indicated.

---

**4.** The facts are derived from the following materials submitted by the parties: (1) "DaimlerChrysler's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment" ("DCF ¶—") (Docket No. 55); (2) the exhibits attached to the "Affidavit of Benjamin N. Strauss, Esq. in Support of DaimlerChrysler's Motion for Summary Judgment" ("DC Ex.—") (attached to Docket No. 53); (3) the "Statement of Undisputed Facts" filed by the Gravas and Grava Motors ("GF ¶—") (Docket No. 56); (4) the exhibits attached to the "Memorandum in Support of Motion for Summary Judgment of Grava of Medford, Inc., Ralph Grava, Eric Grava, and Peter Grava" ("Gr.Ex.—") (Docket No. 52); (5) the "Affidavit of William C. Macintosh in Support of Defendant's Motion for Summary Judgment" ("Macintosh Aff.") (Docket No. 66); (6) the "Plaintiff's Opposition to Defendant's Statement of Undisputed Facts" filed in opposition to DaimlerChrysler's statement of undisputed facts ("PODCF ¶—") (Docket No. 58); (7) the Plaintiff's Opposition to Defendants' Statement of Undisputed Facts ("POGF ¶—") and the Plaintiff's Separate Statement of Undisputed Facts ("PF ¶—"), which are set forth in the "Plaintiff's Opposition to Defendants' Statement of Undisputed Facts and Separate Statement of Undisputed Facts" (Docket No. 61) filed in response to the Grava defendants' statement of undisputed facts; (8) the exhibits attached to the "Affidavit of Timothy K. Cutler, Esq. in Support of Plaintiff's Oppositions to the Motions for Summary Judgment Filed by the Grava Defendants and DaimlerChrysler" ("Pl.Ex.—") (Docket No. 65); and (9) the "Affidavit of Robert O'Neil in Support of Plaintiff's Opposition to Motion for Summary Judgment of Grava of Medford,

### The Parties

Defendant DaimlerChrysler distributes Chrysler, Dodge and Jeep line-makes of new motor vehicles, as well as parts and accessories, to authorized dealers located throughout the United States and abroad. (DCF ¶ 1; PODCF ¶ 1). Defendant Grava Motors is an automobile dealership, which operates a facility in Medford, Massachusetts. (DCF ¶ 2; PODCF ¶ 2). It is authorized to sell and service Chrysler and Jeep line-makes of new motor vehicles at its Medford facility pursuant to Sales and Service Agreements ("SSAs") with DaimlerChrysler. (DCF ¶ 2; PODCF ¶ 2; DC Ex. Y; DC Ex. II). Under the terms of the SSAs, Grava Motors is entitled to purchase new vehicles, parts and accessories at wholesale from DaimlerChrysler, and to sell them at retail to consumers. (DCF ¶ 12). DaimlerChrysler also licenses Grava Motors to advertise itself as a "Five-Star" dealership, thereby holding itself out to the public as a dealer that has met certain service, training and consumer satisfaction standards. (*See* DCF ¶¶ 21, 25; DC Ex. FF). Each of the Gravas has an ownership interest in Grava Motors. (DCF ¶ 3; PODCF ¶ 3).

Plaintiff O'Neil is a Certified Public Accountant, a Certified Financial Planner and a licensed stockbroker who operates an office out of his home in Medford. (DCF ¶¶ 26–27; PODCF ¶¶ 26–27). In December 2001, O'Neil purchased two new Chrysler vehicles, a Sebring and a PT Cruiser, from Grava Motors. (DCF ¶ 28). The January 6, 2006 incident that gives rise to the plaintiff's pending claims in this action occurred following a dispute between the plaintiff and Grava Motors concerning the plaintiff's efforts to obtain reimbursement for repairs made to his two Chrysler vehicles under the terms of extended warranty agreements.

### Plaintiff's Purchase of Service Contracts

When O'Neil purchased the Sebring and PT Cruiser from Grava Motors, he also purchased a Service Contract for each vehicle. (PF ¶ 1). Service Contracts are among the ancillary products that DaimlerChrysler sells to its dealerships at wholesale. (DCF ¶ 15; PODCF ¶ 15). They are separate agreements between the consumer and Daimler–Chrysler, and are treated essentially as extended warranty agreements. (DCF ¶ 16). DaimlerChrysler dealerships such as Grava Motors are authorized to perform repairs and service under the Service Contracts, and DaimlerChrysler then reimburses the dealership for its work. (*Id.*). The consumer pays only a deductible to the dealership. (*Id.*). Thus, although O'Neil purchased Service Contracts for his vehicles from Grava Motors, he entered into those Contracts directly with DaimlerChrysler, and DaimlerChrysler was responsible for the fulfillment of the Contracts' provisions. (PF ¶ 2; Pl.Ex. 1 at 1).

Under the terms of his Service Contracts, O'Neil was required to obtain warranty service from Grava Motors. (*See* Pl.Ex. 1 at 1; PF ¶ 4). If he was unable to return to Grava Motors for such service, O'Neil could request service from any authorized DaimlerChrysler dealership within the United States or Canada. (*See* Pl. Ex. 1 at 1). However, the plaintiff could not obtain reimbursement for the cost of any service or repairs performed by a non-authorized repair facility unless he had sought prior approval from DaimlerChrysler. (DCF ¶ 19).

The parties vigorously dispute whether Grava Motors was acting as an agent of DaimlerChrysler for purposes of selling

Inc., Ralph Grava, Eric Grava and Peter Gra- va" ("O'Neil Aff.") (Docket No. 62).

and performing warranty work under the plaintiff's Service Contracts. O'Neil contends that Grava Motors was Daimler-Chrysler's agent with respect to the Service Contracts. (Pl.'s Opp. to DC Mot. (Docket No. 57) at 2). In support of his position, O'Neil points to evidence in the record, including but not limited to, testimony from Ralph Grava in which Mr. Grava said that he believed Grava Motors was acting as an agent of DaimlerChrysler when it sold O'Neil the Service Contracts, and testimony from Deborah Abner, the Customer Relations Manager at Daimler-Chrysler, in which Ms. Abner agreed that DaimlerChrysler uses the dealerships to interface with customers, and that Grava Motors was acting on DaimlerChrysler's behalf with regard to the Service Contracts. (PF ¶¶ 3, 5–6; Pl.Ex. 2 at 143; Pl.Ex. 3 at 49–50). DaimlerChrysler contends that there was no agency relationship between it and Grava Motors, and that Grava Motors was an independent dealer at all relevant times. (DC Mem. (Docket No. 54) at 14–15). DaimlerChrysler also relies on evidence in the record to support its position, including but not limited to, language in the SSAs between it and Grava Motors, which provides that the dealer is not an agent of DaimlerChrysler and that "under no circumstances is either party to be considered the agent of the other." (DCF ¶ 11; DC Ex. Z at 16 & Ex. II at 16). As detailed below, however, while there is a dispute regarding the nature of the relationship between Daimler-Chrysler and Grava Motors arising from the sale of and performance of work under the Service Contracts, that issue does not need to be resolved in connection with the motion for summary judgment.

### The Dispute Over Warranty Service

In April 2005, O'Neil brought his Sebring to Grava Motors for repairs, including the repair of a broken electric window.

(PF ¶ 7; DCF ¶ 43; PODCF ¶ 43). Although the window repair should have been covered by the plaintiff's Service Contract, Grava Motors charged O'Neil for the cost of the repair, and O'Neil was forced to pay the bill in order to gain the release of his car. (PF ¶ 7). Later, Grava Motors acknowledged that the repair should have been covered by the plaintiff's warranty, but it did not respond to O'Neil's demands for reimbursement in the amount of $210. (PF ¶ 8). Consequently, on August 11, 2005, O'Neil brought a small claims action against Grava Motors in Somerville District Court. (PF ¶ 9; GF ¶ 5). Grava Motors failed to appear in that action, and on about October 6, 2005, O'Neil obtained a default judgment against it in the amount of $702.06. (PF ¶ 9; GF ¶ 6). Grava Motors paid the judgment, but not until after the January 6, 2006 incident that gave rise to O'Neil's claims in this case. (GF ¶¶ 7–8; POGF ¶¶ 7–8).

On November 11, 2005, the water pump in O'Neil's PT Cruiser broke while his wife was using the car in Rhode Island. (DCF ¶ 64). The plaintiff instructed his wife to have the car towed to Northeast Power, a repair shop in Medford, Massachusetts, which is not a DaimlerChrysler authorized service dealership. (DCF ¶¶ 65, 73). Northeast Power fixed the water pump for a cost of $417.55. (DCF ¶¶ 71–72). The plaintiff then sought reimbursement from Grava Motors, which declined the claim because O'Neil had not obtained prior approval from DaimlerChrysler to use a non-authorized repair facility, as required by the terms of O'Neil's Service Contract. (DCF ¶ 75).

On November 29, 2005, O'Neil sent a letter to DaimlerChrysler in which he requested reimbursement for both the cost of the window repair on the Sebring and the cost of the water pump repair on the

PT Cruiser. (DCF ¶ 77). After failing to receive a prompt response from Daimler-Chrysler, O'Neil filed another small claims action on December 22, 2005 against Grava Motors and DaimlerChrysler. (PF ¶ 10; GF ¶ 9). DaimlerChrysler ultimately paid O'Neil for the cost of the water pump repair, less the amount of O'Neil's deductible under the Service Contract, and the case was settled. (See DCF ¶¶ 81, 82; PODCF ¶¶ 81, 82).

### The Events of January 6, 2006

On January 6, 2006, Ms. Abner, the Customer Relations Manager at Daimler-Chrysler, contacted the plaintiff to discuss the small claims action that was pending against DaimlerChrysler. (DCF ¶ 58). During the discussion, O'Neil told Ms. Abner about the judgment he had obtained against Grava Motors with respect to the Sebring, and Ms. Abner said that she would contact Grava Motors regarding the plaintiff's warranty issues. (DCF ¶ 58; O'Neil Aff. ¶ 13). Subsequently, Ms. Abner had a brief conversation with Ralph Grava in which she discussed O'Neil's claims regarding his vehicles. (PF ¶ 57; Pl.Ex. 3 at 37–38; Pl.Ex. 16). According to Ms. Abner, Ralph Grava told her that he was going to contact Mr. O'Neil, and she assumed that the defendant was going to speak with the plaintiff about the car repairs. (Pl.Ex. 3 at 37–38).

Thereafter, Ralph Grava called O'Neil. (GF ¶ 10; POGF ¶ 10). According to the plaintiff, the defendant asked if he was speaking to O'Neil, and when O'Neil said yes, the defendant stated, "I'm coming over. Are you home?" (Pl.Ex. 6 at 294). O'Neil also asserts that when he again answered affirmatively, Ralph Grava stated, "I'm coming over, scumbag" and then hung up. (Id.).

Shortly after the telephone call, the three Gravas arrived at O'Neil's home office. (GF ¶ 12; POGF ¶ 12). Nothing in the record indicates that DaimlerChrysler directed the Gravas to visit O'Neil at his home office on January 6, 2006, or that the visit was made in connection with the performance of work under the plaintiff's Service Contracts. Nor is there any evidence that DaimlerChrysler condoned either the visit or the Gravas' alleged behavior during the course of the visit.

The office is located in the basement of O'Neil's home and has the same address as the plaintiff's house. (O'Neil Aff. ¶¶ 15–16). A sign in front of the house reads "Robert O'Neil, Certified Public Accountant," and a large parking area is located at the property, but there is no sign on the doors of the house identifying the access to the office, and the house itself looks like a residence rather than an office. (Id.; see also Exhibits attached to MacIntosh Aff.).

According to the plaintiff, Ralph Grava, followed by his two brothers, entered the plaintiff's house, walked by the reception area where O'Neil's employee, Paul Recupero, was sitting, and went into O'Neil's office, where O'Neil was meeting with a client, Joseph Passamante. (GF ¶ 13). Eric and Peter Grava remained in the doorway to O'Neil's office. (Gr. Ex. C at 118; Grava Mem. (Docket No. 52) at 3). O'Neil then asked Ralph Grava to wait until he had completed his meeting with Mr. Passamante, but Ralph Grava said, "[n]o. I came here to put a face to the name so I can take care of this my [way] on the street you scumbag." (Gr. Ex. C at 113, 120, 304). O'Neil did not respond, and Ralph Grava continued by stating, "[w]e are going to get you. We are going to fix you." (Id. at 120; Grava Mem. at 3). O'Neil then asked if he was being threatened, and one of the Gravas standing in the doorway responded, "[t]ake it any way you want." (Gr. Ex. C at 121; Grava Mem. at 3). Additionally, according to the plaintiff, Ralph Grava asked why O'Neil

was suing him, and when O'Neil attempted to explain, Ralph Grava cut him off, saying something to the effect of "we're going to aggravate you" or "I'm going to get you." (Gr. Ex. C at 122–24). During the parties' exchange, Ralph Grava spoke in a raised voice, stood within feet of O'Neil and pointed his finger at the plaintiff. (PF ¶ 19; Pl.Ex. 7 at 340).

After the exchange inside O'Neil's office, the Gravas left the house. (Pl.Ex. 6 at 130). Once outside, Ralph Grava told O'Neil that he would have him arrested if he stepped foot on the lot of Grava Motors. (*Id.* at 130–31). The Gravas then left the premises. (*See id.* at 133–34).

It is undisputed that none of the Gravas made physical contact with O'Neil at any time during the January 6, 2006 incident, which O'Neil estimates to have lasted about one to five minutes. (GF ¶ 14; POGF ¶ 14; Gr. Ex. C at 124–25). However, O'Neil claims that he felt physically threatened and feared that he would be attacked, both during the course of the incident and after it had ended. (Pl.Ex. 6 at 135–39, 295). Mr. Passamante and Mr. Recupero also understood, based on their observations of the incident, that Ralph Grava was threatening to physically harm the plaintiff. (Pl.Ex. 8 at 102–03; Pl.Ex. 10 at 154–55).

O'Neil contends that as a result of the events of January 6, 2006, he has experienced mental anguish, ongoing lack of sleep, knots in his stomach, minor headaches and fear of walking down the street. (GF ¶ 18). He also claims that he nervously looks over his shoulder, watches to see who is ringing the door bell, and is cautious about who is entering his house. (*Id.*). Following the January 6, 2006 incident, O'Neil had one visit with his primary care physician, who prescribed Ambien to help O'Neil sleep at night. (GF ¶ 19). He has not been on any other medication and

he has not seen any other doctor, therapist or health care provider in connection with the events of January 6, 2006. (DCF ¶ 89).

### *Events After January 6, 2006*

Following the incident, O'Neil filed a report with the Medford Police in which he complained about the Gravas' actions. (*See* DC Ex. U). He also notified the offices of the Mayor, the District Attorney and the Attorney General. (DC Ex. C at 533–35). Although the police conducted an investigation, none of these entities ever expressed a willingness to initiate any proceedings against the Gravas. (*Id.*). Additionally, O'Neil sent a copy of his police report to DaimlerChrysler, but Daimler-Chrysler did not contact Grava Motors or take any other action regarding the plaintiff's complaint. (Pl.Ex. 3 at 39–41). On March 29, 2006, O'Neil initiated the instant civil action by filing his complaint in state court, and on April 28, 2006, the matter was removed to this court. (*See* Notice of Removal (Docket No. 1)).

Additional facts relevant to this court's analysis are provided below.

### III. *ANALYSIS—DAIMLERCHRYS-LER'S MOTION FOR SUM-MARY JUDGMENT*

#### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st

Cir.1996) (quotations and citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Id.* (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. The non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville,* 431 F.Supp.2d 134, 143 (D.Mass.2006).

### B. *Claims Predicated Upon Agency Relationship Between the Defendants*

O'Neil contends that DaimlerChrysler is vicariously liable, under an agency theory, for the Gravas' conduct on January 6, 2006. Thus, it is undisputed that the plaintiff's claims against DaimlerChrysler for assault, trespass, intentional infliction of emotional distress, negligent infliction of emotional distress, false imprisonment and violation of the plaintiff's civil rights arise from the incident that occurred at O'Neil's home office on January 6, 2006, and that any finding of liability against Daimler-Chrysler on one or more of those claims must be predicated upon a showing that the Gravas were acting as agents of DaimlerChrysler at the time of the incident. (*See* DC Mem. at 14–18; Pl.'s Opp. to DC Mot. at 7–14). As detailed below, even if it is assumed that Grava Motors was an agent of DaimlerChrysler for purposes of selling, performing warranty work under and interacting with customers in connection with the Service Contracts, as the plaintiff contends, O'Neil has presented no facts to support a conclusion that the Gravas were acting within the scope of their authority as agents of DaimlerChrysler during the incident at O'Neil's home office. Therefore, this court concludes that DaimlerChrysler is entitled to summary judgment with respect to the Sixth through Tenth and Twelfth Causes of Action.

 "An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." *Theos & Sons, Inc. v. Mack Trucks, Inc.,* 431 Mass. 736, 742, 729 N.E.2d 1113, 1119 (2000). In the instant action, the plaintiff has presented evidence, including but not limited to testimony from Ralph Grava and Deborah Abner, to support his claim that Grava Motors was acting as an agent of DaimlerChrysler for purposes of selling Service Contracts to customers and performing the warranty work under those Contracts.[5] Nevertheless, such evidence

---

**5.** Although the Supreme Judicial Court of Massachusetts has not decided the issue,

alone is not sufficient to defeat summary judgment for DaimlerChrysler. "Even where an agent-principal relationship exists ... the principal has liability for the agent's acts toward third parties only if the agent was acting with the actual or apparent authority of the principal in that transaction." *Id.* at 743, 729 N.E.2d at 1120. Accordingly, DaimlerChrysler can be liable for the Gravas' conduct only if the plaintiff is able to present facts showing that the Gravas were acting within the scope of their actual or apparent authority when they confronted O'Neil at his home office. Nothing in the record on summary judgment supports such a conclusion.

■ To establish the existence of actual or apparent authority, O'Neil must present evidence showing that DaimlerChrysler "explicitly or impliedly manifestly agreed or consented" to the Gravas' visit to O'Neil's home. *Normandin v. Eastland Partners, Inc.,* 68 Mass.App.Ct. 377, 385, 862 N.E.2d 402, 411 (2007). However, the plaintiff has failed to identify any specific words or conduct by which DaimlerChrysler's consent was either manifested or could be implied. The fact that Daimler-Chrysler designated Grava Motors as an authorized dealership for purposes of performing warranty work under the terms of O'Neil's Service Contracts, or that DaimlerChrysler allowed Grava Motors to advertise itself as a "Five–Star" dealership, cannot be interpreted as granting consent to the dealership's owners to confront a customer at his home and make allegedly threatening statements to him. *See Theos & Sons,* 431 Mass. at 746, 729 N.E.2d at 1122 (dealership's representation of itself as manufacturer's authorized parts and service dealer for purposes of providing warranty work insufficient to establish ap-

parent authority to act as manufacturer's agent for nonwarranty work). Similarly, nothing that Ms. Abner did or said can be viewed as authorizing Ralph Grava or his brothers to engage in such conduct. In particular, O'Neil has proffered no evidence suggesting that Ms. Abner, either in her conversation with Ralph Grava or otherwise, encouraged the defendants to approach the plaintiff and threaten him on DaimlerChrysler's behalf. Indeed, nothing in the record indicates that Ms. Abner even knew of the Gravas' decision to visit O'Neil in person, much less that she authorized their actions.

■ Nor has O'Neil shown that Ms. Abner's statements to him gave the Gravas apparent authority to act on behalf of DaimlerChrysler. "Apparent authority, is 'created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'" *Id.* at 745, 729 N.E.2d at 1120 (quoting Restatement (Second) of Agency § 27 (1958)). Ms. Abner's statement to O'Neil that she would contact Grava Motors to discuss the plaintiff's warranty issues could not reasonably have caused the plaintiff to believe that the Gravas had permission to engage in the conduct complained of in this action. Accordingly, DaimlerChrysler is entitled to summary judgment on all of the claims arising from the incident on January 6, 2006, including all of the claims set forth in the Sixth through Tenth and Twelfth Causes of Action.

### C. *Claim Under Chapter 93A*

DaimlerChrysler has moved for summary judgment on O'Neil's Chapter 93A

---

"[o]ther courts have held that an agency relationship may exist between a manufacturer and a dealer or authorized dealer for the

purposes of performing warranty work." *Theos & Sons,* 431 Mass. at 743 n. 12, 729 N.E.2d at 1119 n. 12.

claim on the grounds that O'Neil has failed to present evidence showing that Daimler-Chysler committed an unfair or deceptive act or practice and on the grounds that O'Neil failed to comply with the statute's notice provisions. (DC Mem. at 19). O'Neil does not contend that Daimler-Chrysler engaged in any unfair or deceptive acts or practices other than the conduct complained of in the Sixth through Tenth and Twelfth Causes of Action. (*See* Pl.'s Opp. to DC Mot. at 16–17). Because DaimlerChrysler is entitled to summary judgment on those claims, it is entitled to summary judgment on O'Neil's Chapter 93A claim as well.[6] Therefore, Daimler-Chrysler's motion is allowed with respect to the Thirteenth Cause of Action, as a result of which there are no claims remaining against DaimlerChrysler.[7]

## IV. ANALYSIS—THE GRAVA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Gravas and Grava Motors have moved for summary judgment on all of the remaining claims against them. For the reasons set forth below, the defendants are entitled to summary judgment with respect to the plaintiff's claims for false imprisonment and civil rights violations. However, O'Neil has presented evidence, which when viewed in his favor, establishes the existence of a genuine issue of material fact with respect to his claims for conspiracy, assault, trespass, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of Chapter 93A. Accordingly, the motion is allowed with respect to the Tenth and Twelfth Causes of Action, but denied with respect to the Fourth, Sixth, Seventh, Eighth, Ninth and Thirteenth Causes of Action.

### A. Fourth Cause of Action: Conspiracy

The defendants assert, in support of their motion for summary judgment on the plaintiff's Fourth Cause of Action, that O'Neil has failed to present facts supporting the existence of a conspiracy. The motion is denied with respect to this claim. When the record is viewed in the light most favorable to O'Neil, the evidence supports a claim that the Gravas engaged in a common plan to commit a tortious act against the plaintiff.

■ "Under Massachusetts law, either of two possible causes of action may be called 'civil conspiracy.'" *Aetna Cas. Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994). The first is a "coercive type" of civil conspiracy, which requires the plaintiff to establish "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." *Id.* (quoting *Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985)). The "second type of civil conspiracy," which is at issue in this case, "is more akin to a theory of common law joint liability in tort[,]" and it "is invoked to support liability of one person for a tort committed by another." *Id.* at 1564. "For liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, be-

---

**6.** Because DaimlerChrysler is entitled to summary judgment due to the lack of evidence showing that the company engaged in any unfair or deceptive acts or practices, it is unnecessary to address the defendant's argument that O'Neil failed to comply with the notice requirements of Chapter 93A.

**7.** In light of this court' ruling with respect to DaimlerChrysler's motion for summary judgment, O'Neil is not entitled to pursue the relief sought against DaimlerChrysler in his Fourteenth and Fifteenth Causes of Action. *See* note 1, *supra*.

tween two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Id.* "As the [Massachusetts] Appeals Court observed, '[k]ey to this [latter] cause of action is a defendant's substantial assistance [to another], with the knowledge that such assistance is contributing to a common tortious plan.'" *Haemonetics Corp. v. Dupre,* 238 B.R. 224, 228 (D.Mass.1999) (quoting *Kurker v. Hill,* 44 Mass.App.Ct. 184, 189, 689 N.E.2d 833, 837 (1998)), *aff'd* 229 F.3d 1133 (1st Cir.2000).

█ The circumstances surrounding the January 6, 2006 incident at O'Neil's home office support a claim for the second form of conspiracy. In particular, a jury viewing the evidence in the light most favorable to O'Neil could find that the individual Grava defendants engaged in a common plan *to* confront the plaintiff in his home office and threaten him for the purpose of punishing him for bringing small claims actions against their dealership and intimidating him *into* refraining *from* seeking warranty service from Grava Motors in the future. As described below, the record supports the plaintiff's claims that the defendants' conduct constituted tortious activity. Moreover, a jury could reasonably infer from the circumstances of the Gravas' visit that the defendants had an implied agreement to engage in the complained of behavior and that each of the Gravas acted with the knowledge that he was participating in the alleged wrongdoing. *See Aetna,* 43 F.3d at 1565 (evidence regarding parties' conduct may support inference of agreement between co-conspirators "under which they played different roles, but nevertheless acted together with a common design" to commit wrongdoing). Therefore, the motion for summary judgment on O'Neil's conspiracy claims is denied.

### B. Sixth Cause of Action: Assault

The Grava defendants contend that O'Neil has failed to present sufficient facts to support a prima facie claim of assault. This court disagrees and finds that the Gravas and Grava Motors are not entitled to summary judgment on O'Neil's Sixth Cause of Action.

█ Under Massachusetts law, "an assault may be accomplished in one of two ways—either by an attempted battery, or by putting another in fear of an immediately threatened battery. Thus, an assault is defined as either an attempt to use physical force on another, or as a threat of use of physical force." *Commonwealth v. Gorassi,* 432 Mass. 244, 247–48, 733 N.E.2d 106, 109–10 (2000) (internal citations omitted). In the instant action, the plaintiff is relying upon the latter definition. (*See* Pl.'s Opp. to Grava Mot. (Docket No. 60) at 6–7).

█ "In the case of a threatened battery type of assault, the [plaintiff] must prove that the defendant engaged in 'objectively menacing' conduct with the intent to put the victim in fear of immediate bodily harm." *Gorassi,* 432 Mass. at 248, 733 N.E.2d at 110 (quoting *Commonwealth v. Musgrave,* 38 Mass.App.Ct. 519, 524 n. 7, 649 N.E.2d 784, 787 n. 7 (1995)). "[W]hat is essential is that the defendant intended to put the victim in fear of imminent bodily harm, not that the defendant's actions created a generalized fear or some other unspecified psychological harm in the victim." *Id.* at 249, 733 N.E.2d 106, 733 N.E.2d at 110 Moreover, "[w]ords do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." *Gouin v. Gouin,* 249 F.Supp.2d 62, 69 (D.Mass.2003) (quoting *Commonwealth v. Delgado,* 367 Mass. 432, 437 n. 3, 326 N.E.2d 716, 719 n. 3

(1975)) (additional quotations and citations omitted). "Thus, threatening words accompanied by objectively menacing gestures which create an imminent apprehension of harmful contact may be sufficient under Massachusetts law to constitute the tort of assault." *Id.* at 70.

In the instant case, the plaintiff has presented facts, which when viewed in his favor, could support a conclusion that the Gravas' conduct put O'Neil in reasonable apprehension of imminent physical harm. In particular, O'Neil has presented evidence showing that he felt physically threatened during the course of the incident, and that witnesses who were present in the office at the time feared that he would be attacked. (Pl.Ex. 6 at 135–39, 295; Pl.Ex. 8 at 102–03; Pl.Ex. 10 at 154–55). Moreover, a jury could find that Ralph Gravas' words to the effect that the Gravas were going to "get" O'Neil, "aggravate" him and "fix" him were threatening and that those words, combined with the tone of Ralph Gravas' voice, his finger-pointing and the Gravas' actions in entering O'Neil's home uninvited, interrupting a client meeting, and blocking the door to his office, constituted objectively menacing conduct that manifested an intent by all three Gravas to put the plaintiff in fear of immediate bodily harm. Therefore, the defendants' motion for summary judgment with respect to the assault claim is denied.[8]

---

8. The defendants argue that summary judgment in their favor is warranted because the Medford police officer who investigated the events of January 6, 2006 concluded that the Gravas made no criminal threats to O'Neil. (Grava Mem. at 12). The fact that a particular police officer concluded that no criminal activity had taken place is not controlling on the issue whether the plaintiff in this civil action can establish by a preponderance of the evidence that the defendants are liable for tortious conduct.

## C. Seventh Cause of Action: Trespass

The defendants have moved for summary judgment on O'Neil's claim of trespass on the grounds that they had an implied license to enter the premises due to the plaintiff's operation of a business there, and that their presence at O'Neil's home office cannot be deemed unlawful. (Grava Mem. at 12–14). This court finds that disputed issues of fact exist as to whether the Gravas were privileged either to enter the property on January 6, 2006, or whether they wrongfully refused to leave, thereby precluding summary judgment in the defendants' favor.

"A trespass ... requires an unprivileged, intentional intrusion on land in the possession of another." *Wellesley Hills Realty Trust v. Mobil Oil Corp.*, 747 F.Supp. 93, 99 (D.Mass.1990). Accordingly, a person who has a privilege to enter the property of another cannot be liable for trespass. "A licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent." Restatement (Second) of Torts § 330 (1965).[9] Therefore, at issue in the instant case is whether O'Neil consented to the Gravas' visit by holding his home out to the public as a business establishment.

A license to enter another's property may be granted by words or by conduct manifesting consent. *Id.,* Comments *d.* & *e.* In either case, "it is the manifestation of

---

9. A licensee is distinguishable from an invitee. Thus, an invitee comes upon premises for purposes connected with a business carried on there, or in the interest of the occupant, while a licensee comes upon such premises for his own purposes. *Brosnan v. Koufman,* 294 Mass. 495, 500, 2 N.E.2d 441, 443 (1936). *See also* and *compare* Restatement (Second) of Torts § 330 (1965) (defining licensees) *with* Restatement (Second) of Torts § 332 (1965) (defining invitees).

consent which is decisive and not the state of mind which the possessor intends to express." *Id.*, Comment *d.* Thus, "the decisive factor is the interpretation which a reasonable [person] would put upon the possessor's acts." *Id.*, Comment *e.* Moreover, "[i]n determining whether a particular course of action is sufficient to manifest a consent to enter the land, consideration must be given to all of the surrounding circumstances." *Id.*

When viewed in the light most favorable to the plaintiff, the evidence is sufficient to create a genuine dispute as to whether O'Neil manifested consent to the Gravas' entry upon his property. Although O'Neil has a sign in front of his house identifying it as an accountant's office, the office is located at the same address as O'Neil's residence and there are no signs stating that it is open to the public. (O'Neil Aff. ¶ 16). Additionally, the house has the appearance of a private residence, the entrance to the office also serves as the main entrance to the home, and there are no signs on the doors identifying the location of the office or inviting visitors inside. (O'Neil Aff. ¶¶ 15; *see also* Exhibits attached to MacIntosh Aff.). Accordingly, a reasonable person viewing the property could conclude that it was open only to a particular class of individuals, such as clients and friends of the occupant, rather than to the general public.

 Moreover, the fact that O'Neil did not object when Ralph Grava called and declared his intention to come over is not sufficient to establish O'Neil's consent to the visit. "[T]he fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifestation of consent, and therefore is not necessarily permission." Restatement (Second) of Torts § 330, Comment *c.* Therefore, a question of fact exists as to whether a reasonable person viewing all of the circumstances would conclude that O'Neil's conduct constituted the necessary consent.

 O'Neil argues that even if the Gravas were considered licensees, any permission to enter his home office was revoked by his request that they leave. (Pl.'s Opp. to Grava Mot. at 15). "[I]t is of the essence of a license that it is revocable at the will of the possessor of the land." *Cablevision of Boston, Inc. v. Shamatta*, 63 Mass.App.Ct. 523, 525, 827 N.E.2d 246, 248 (2005) (quoting *Baseball Pub. Co. v. Bruton*, 302 Mass. 54, 56, 18 N.E.2d 362 (1938)). Here, there are disputed facts such that the jury should determine whether the Gravas refused to leave the premises after being asked to do so. O'Neil contends that he repeatedly asked the defendants to leave his office, but they refused. The defendants, on the other hand, point to O'Neil's deposition testimony to the effect that he did not ask the Gravas to leave the premises until the defendants had left the plaintiff's office and were outside in the driveway. (Gr. Ex. C at 304–05). Based on this record, the question whether the Gravas' actions constituted trespass is one for the finder of fact.

### D. *Eighth Cause of Action: Intentional Infliction of Emotional Distress*

The Grava defendants assert that they are entitled to a judgment as a matter of law on O'Neil's claim for intentional infliction of emotional distress because their actions on January 6, 2006 were not "extreme and outrageous," "beyond all possible bounds of decency," or "utterly intolerable in a civilized community." (Grava Mem. at 14–15). This court finds that the question whether the Gravas' conduct was extreme and outrageous should be determined by a jury.

In order to prevail on a claim for intentional infliction of emotional distress, "a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Sena v. Commonwealth*, 417 Mass. 250, 263–64, 629 N.E.2d 986, 993 (1994) (quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976)). "To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community. Liability cannot be founded upon mere insults, threats, or annoyances." *Id.* at 264, 629 N.E.2d at 993 (internal quotations and citations omitted).

O'Neil has presented facts and circumstances which reasonably could lead a trier of fact to conclude that the defendants' conduct was "extreme and outrageous, exceeding mere insult or minor annoyance." *Boyle v. Wenk*, 378 Mass. 592, 595, 392 N.E.2d 1053, 1055 (1979). When the evidence is viewed most favorably to O'Neil, a jury could conclude that the Gravas' actions in bursting into the plaintiff's home office without permission, threatening him with physical harm, and placing him in genuine fear for his personal safety in an effort to intimidate him and punish him for filing an action against them in small claims court together amounted to more than mere threats, "bad manners, or relatively minor annoyances[,]" and that such conduct is utterly intolerable in a civilized community. *Id.* Because O'Neil has raised a triable issue as to whether the Gravas' conduct was extreme and outrageous, the motion for summary judgment as to the Eighth Cause of Action is denied.

### E. Ninth Cause of Action: Negligent Infliction of Emotional Distress

The Grava defendants contend that their motion should be granted with respect to O'Neil's claims for negligent infliction of emotional distress because the plaintiff has failed to present sufficient evidence of harm. Although the question is a close one, this court finds that the issue should be decided by the jury and summary judgment with respect to O'Neil's Ninth Cause of Action is denied.

To prove a claim for negligent infliction of emotional distress under Massachusetts law, the plaintiff must establish "1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective symptomatology; and 5) that a reasonable person would have suffered emotional distress under circumstances of the case." *Godette v. Stanley*, 490 F.Supp.2d 72, 81 (quoting *Payton v. Abbott Labs*, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982)). In *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 605 N.E.2d 805 (1993), Massachusetts' highest court "expanded the range of symptoms that may provide the type of objective evidence to prove physical harm to include symptoms that could be classified as more 'mental' than 'physical.'" *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 412, 772 N.E.2d 552, 566 (2002). However, the court "explicitly stated that '[a] successful negligent infliction of emotional distress claim' . . . must do more than allege 'mere upset, dismay, humiliation, grief and anger.'" *Id.* (quoting *Sullivan*, 414 Mass. at 137, 605 N.E.2d at 809–10) (additional quotations and citation omitted). Thus, "[i]n order to survive summary judgment, a plaintiff must corroborate his claims of mental distress with sufficient objective evidence of harm." *Godette*, 490 F.Supp.2d at 81. "While expert medical testimony might be needed to make this

showing, it [is] not mandatory." *Rodriguez v. Cambridge Hous. Auth.,* 443 Mass. 697, 702, 823 N.E.2d 1249, 1253 (2005). Moreover, "[t]he length of time that [the] plaintiff[ ] experienced particular symptoms could be one reliable indicator of the sufficiency of [his] evidence." *Id.*

 O'Neil contends that he has experienced various symptoms of emotional distress as a result of the Gravas' conduct on January 6, 2006, including ongoing lack of sleep, knots in his stomach, minor headaches, and fear. (GF ¶ 18). His testimony is supported by that of other witnesses, including Messrs. Passamante, LaVerde and Recupero. Courts analyzing negligent infliction of emotional distress claims have found similar types of symptoms adequate to satisfy the physical harm requirement where such symptoms were sufficiently particularized and were supported by corroborating evidence. *See e.g., Rodriguez,* 443 Mass. at 704–05 & n. 8, 823 N.E.2d at 1255 & n. 8 (plaintiff able to support emotional distress claim where evidence of her fear and confusion was supported by medical records and testimony from physician describing plaintiff's symptoms and extent of her emotional trauma); *Sullivan,* 414 Mass. at 130–32, 139, 605 N.E.2d at 806–07, 810 (plaintiffs able to overcome summary judgment where they presented affidavits from medical personnel showing that they suffered from such symptoms as posttraumatic stress disorder, tension headaches, sleeplessness, gastrointestinal distress, nightmares and depression); *Bresnahan v. McAuliffe,* 47 Mass.App.Ct. 278, 285, 712 N.E.2d 1173, 1178 (1999) (evidence supported by affidavits from nurses showing that plaintiffs suffered from stomach pain, nausea, body shakes and reduced libido sufficient to survive summary judgment on emotional distress claims).

The requirement of physical harm serves "to limit frivolous suits and those in which only bad manners or mere hurt feelings are involved." *Payton v. Abbott Labs,* 386 Mass. 540, 555, 437 N.E.2d 171, 180 (1982). "Rather, plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial." *Sullivan,* 414 Mass. at 137–38, 605 N.E.2d at 810. In the instant case, the plaintiff has presented sufficient evidence so that the issue of negligent infliction of emotional distress should be resolved by the jury.

### F. Tenth Cause of Action: False Imprisonment

 The Grava defendants are seeking summary judgment on O'Neil's false imprisonment claim on the grounds that O'Neil was never confined by the Gravas on January 6, 2006. (Grava Mem. at 17). To prove a claim of false imprisonment, the plaintiff must demonstrate "conduct by the actor which is intended to, and does in fact, 'confine' another 'within boundaries fixed by the actor' where, in addition, the victim is either 'conscious of the confinement or is harmed by it.'" *McCann v. Wal–Mart Stores, Inc.,* 210 F.3d 51, 53 (1st Cir.2000) (quoting Restatement (Second) of Torts § 35 (1965)). *See also Cremaldi–Vickery v. Otis Elevator, Inc.,* 57 Mass. App.Ct. 1105, 782 N.E.2d 48, 2003 WL 168452, at *2 (Jan. 24, 2003) (unpub.op.) ("A defendant is liable for false imprisonment if: (a) he acts intending to confine another within fixed boundaries; (b) the act directly or indirectly results in confinement; and (c) the plaintiff is conscious of the confinement."). Thus, it is critical to a claim for false imprisonment that the defendants' acts resulted in the plaintiff's confinement.

■ This court concludes that even when the record is viewed in the light most favorable to O'Neil, no reasonable jury could conclude that the Gravas intended to confine the plaintiff within boundaries fixed by the Gravas, or that the Gravas' conduct did result in such a confinement. The evidence shows that during the incident at O'Neil's home office, the Gravas did not place O'Neil anywhere, did not touch O'Neil and did not tell him that he could not leave. Furthermore, even assuming, as the plaintiff contends, that O'Neil felt he could not leave his office due to the defendants' presence in the doorway, there is no evidence that O'Neil asked or otherwise attempted to leave and was unable to do so. (*See* Pl.'s Opp. to Grava Mot. at 20–21). Moreover, it is undisputed that the entire incident lasted no more than one to five minutes. (Gr. Ex. C at 124–25). Therefore, to the extent O'Neil's only means of escape was blocked temporarily, it was quickly restored, and O'Neil was able to follow the Gravas as they left the house and proceeded outside. (*See* Pl.Ex. 6 at 130–31). Consequently, the plaintiff has failed to establish that he was actually confined, and the defendants are entitled to summary judgment on O'Neil's Tenth Cause of Action.

### G. Twelfth Cause of Action: Violation of Civil Rights

In his Twelfth Cause of Action, O'Neil asserts that the Grava defendants violated his civil rights pursuant to Mass. Gen. Laws ch. 265, § 37 and Mass. Gen. Laws ch. 12, §§ 11H and 11I. For the reasons that follow, the defendants are entitled to summary judgment with respect to these claims.

■ As an initial matter, the plaintiff may not pursue a claim against the Grava defendants under Mass. Gen. Laws ch. 265, § 37.[10] That statute is a criminal civil rights statute, which provides no civil cause of action. *See Commonwealth v. Pike*, 52 Mass.App.Ct. 650, 653, 756 N.E.2d 1157, 1159 (2001) (criminal complaint brought against defendant under Mass. Gen. Laws ch. 265, § 37). Therefore, the plaintiff's claim under the statute shall be dismissed.

O'Neil's claims under Mass. Gen. Laws ch. 12 fare no better. In order to prove a claim under sections 11H & 11I[11] of the statute, the plaintiff must establish that "1) his/her exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Com-

---

10. Mass. Gen. Laws ch. 265, § 37 provides as follows: "No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States. Any person convicted of violating this provision shall be fined not more than one thousand dollars or imprisoned not more than one year or both; and if bodily injury results, shall be punished by a fine of not more than ten thousand dollars or by imprisonment for not more than ten years, or both."

11. Mass. Gen. Laws ch. 12, § 11H reads in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

monwealth, 2) has been interfered with, or attempted to be interfered with, and 3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Ali v. Univ. of Mass. Med. Ctr.*, 140 F.Supp.2d 107, 110 (D.Mass.2001) (quoting *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395, 668 N.E.2d 333, 337 (1996)). O'Neil cannot support such a claim against the Grava defendants because he has failed to adequately identify any civil rights that were interfered with by the defendants' actions.[12]

 O'Neil argues that the Gravas interfered with his right to justice under the Massachusetts Constitution "[b]y going to Mr. O'Neil's house and threatening him regarding the filing, prosecution and collection on the two small claims actions[.]" (Pl's Opp. to Grava Mot. at 21). However, to the extent O'Neil is asserting a violation of his right to access the courts, the facts set forth in the record do not support such a claim. Rather, the evidence demonstrates that O'Neil fully prosecuted his small claims actions, and that nothing the defendants did on January 6, 2006 interfered with his ability to use the legal system. Furthermore, the evidence indicates that O'Neil's small claims actions were successful, and that he ultimately recovered more money as a result of his small claims cases than he would have been entitled to under his Service Contracts. (*See* PF ¶¶ 8–9; GF ¶¶ 6–8; POGF ¶¶ 7–8; DCF ¶¶ 72, 81–82; PODCF ¶¶ 81–82). Since O'Neil has not presented any facts to support a claim under Mass. Gen. Laws ch. 12, summary judgment in favor of the defendants shall be entered.

### H. *Thirteenth Cause of Action: Violation of Chapter 93A*

Finally, the Grava defendants have moved for summary judgment with respect to O'Neil's claims under Chapter 93A on the grounds that the plaintiff has failed to establish any basis to support a conclusion that the Gravas or Grava Motors engaged in any unfair or deceptive business practices on January 6, 2006. (*See* Grava Mem. at 19–20). Chapter 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The record, when viewed most favorably to the plaintiff, is sufficient to state a claim under Chapter 93A.

Chapter 93A "is intended to protect against unfair and deceptive practices in trade, not unfair practices in general." *L.B. Corp. v. Schweitzer–Mauduit Int'l, Inc.*, 121 F.Supp.2d 147, 152 (D.Mass. 2000). Consequently, "a plaintiff must allege some sort of transaction between the parties for liability to attach . . . ." *Id.* The defendants contend that because all warranty and service claims have been resolved, there is no business transaction to support a 93A claim. However, the statute is not so limited. A Chapter 93A claim is not coterminous with a breach of contract claim. *See Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass. App.Ct. 416, 418, 671 N.E.2d 963, 965 (1996) ("mere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under G.L. c. 93A.").

 O'Neil contends that the defendants were acting in furtherance of their business interests when they confronted

---

**12.** For this reason, *Ayasli v. Armstrong*, 56 Mass.App.Ct. 740, 780 N.E.2d 926 (2002), on which O'Neil relies, has no application to the instant case. *Ayasli* involved clearly identified rights to use and enjoyment of property as guaranteed by Articles 1, 10 and 12 of the Massachusetts Declaration of Rights. *See id.* at 750, 780 N.E.2d at 934.

him in his home. There is evidence to support this contention, including the allegation that Ralph Grava made a number of comments regarding the parties' relationship under the Service Contracts and Grava Motors' unwillingness to perform any more repairs on the plaintiff's vehicles. (Pl's Opp. to Grava Mot. at 23–24). Chapter 93A relates to individuals acting in a "business context" and whether a particular transaction "takes place in a 'business context' must be determined from the facts of each case[.]" *Billings v. Wilson,* 397 Mass. 614, 616, 493 N.E.2d 187, 188 (1986). O'Neil's claims are sufficient to survive the motion for summary judgment.

## V. CONCLUSION

For all the reasons detailed herein, this court finds that DaimlerChrysler is entitled to judgment as a matter of law on all of the claims asserted against it. The Grava defendants are entitled to summary judgment with respect to the plaintiff's claims against them for false imprisonment and civil rights violations. This court further finds that there are disputed facts precluding the entry of summary judgment for the Grava defendants in connection with the plaintiff's remaining claims. Therefore, the case shall proceed to trial on the Fourth through Ninth and Thirteenth Causes of Action, *i.e.,* the claims of conspiracy, assault, trespass, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of Chapter 93A. Accordingly, DaimlerChrysler's motion for summary judgement (Docket No. 53) is ALLOWED and the Grava defendants' motion for summary judgment (Docket No. 51) is ALLOWED IN PART and DENIED IN PART.